# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2173

_____

United States of America,                    *
                                              *
        Plaintiff - Appellee,                 *
                                              *    Appeal from the United States
v.                                            *    District Court for the
                                              *    District of South Dakota.
Fritz Arlo Looking Cloud,                     *
                                              *
        Defendant - Appellant.                *

_____

Submitted: January 10, 2005
Filed: August 19, 2005

_____

Before BYE, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Fritz Arlo Looking Cloud appeals his conviction for the first degree murder of Anna Mae Aquash following a jury trial. His grounds for appeal are: (1) admission of irrelevant, prejudicial evidence; (2) admission of hearsay and an improper limiting instruction; (3) ineffective assistance of counsel; and (4) insufficient evidence to support his conviction. The district court[1] sentenced him to life in prison. We affirm.

_____

[1]The Honorable Lawrence L. Piersol, Chief Judge, United States District Court for the District of South Dakota.

Aquash's badly decomposed body was discovered in 1976, and police began to suspect foul play after identifying her as having been involved with the American Indian Movement.[2] Due to lack of cooperation, the investigation made little headway until agents began talking to Looking Cloud in the mid-90s. Looking Cloud and almost every other witness in the case were members of, and were actively involved in, the American Indian Movement at the time of Aquash's death. The government's theory at trial was that Looking Cloud and other American Indian Movement members killed Aquash, who was also a member, because they suspected she was a federal informant, working with the government.

---

[2]This case is one of several cases to involve mid-1970s events at Pine Ridge Indian Reservation. The occupation of the village of Wounded Knee in 1973 involved a stand off between a group of armed Native Americans and federal authorities. See Bissonette v. Haig, 776 F.2d 1384, 1385 (8th Cir. 1985), cert. granted, 479 U.S. 1083 (1987), aff'd for lack of quorum under 28 U.S.C. § 2109, 485 U.S. 264 (1988). After the occupation, residents of the area brought an action against federal officials and military personnel, alleging that the seizure and confinement violated their constitutional rights. Id. at 1386. Two years after the occupation, American Indian Movement members camped out at the Pine Ridge Indian Reservation to protect reservation traditionalists, who were in a violent political struggle with Native Americans who supported the Bureau of Indians Affairs. Peltier v. Booker, 348 F.3d 888, 889 (10th Cir. 2003), cert. denied, 541 U.S. 1003 (2004). Leonard Peltier, an American Indian Movement leader, was convicted of killing two FBI agents during his stay at the Reservation. Id. Peltier's conviction and sentence of two consecutive life terms withstood several appeals and proceedings for post-conviction relief. See United States v. Peltier, 585 F.2d 314 (8th Cir. 1978) (affirmed 1977 conviction); United States v. Peltier, 731 F.2d 550 (8th Cir. 1984) (remanded for evidentiary hearing on Peltier's 1983 new trial motion on ground of newly discovered evidence ); United States v. Peltier, 800 F.2d 772 (8th Cir. 1986) (affirmed district court's denial of Peltier's new trial motion following evidentiary hearing); Peltier v. Henman, 997 F.2d 461 (8th Cir. 1993) (affirmed denial of post-conviction relief); Peltier v. Booker, 348 F.3d 888 (10th Cir. 2003) (affirmed denial of habeas corpus relief seeking immediate parole), cert. denied, 541 U.S. 1003 (2004).

When the rumor began to spread around the American Indian Movement that Aquash was an informant, she fled Pierre to Denver. A few weeks later, Looking Cloud, Theda Clark and John Graham (also called John Boy Patton)[3] received orders from the American Indian Movement to bring Aquash back to South Dakota. They tied her up and drove her to Rapid City to question her about being an informant. Aquash was constantly guarded and her requests to be let free were refused. At some point, Aquash realized that she was about to be killed. Looking Cloud, Clark, and Graham met with other American Indian Movement members in Rapid City and eventually the three drove Aquash to an area near Wanblee. Aquash begged to go free, prayed, and cried. Looking Cloud and Graham marched Aquash up a hill and Graham shot her at the top of a cliff. Her body was either thrown or it tumbled to the bottom of that cliff.

## I.

Looking Cloud argues that the district court erred in admitting evidence about the activities of the American Indian Movement because it was irrelevant to the murder charge or, alternatively, because it was overly prejudicial. Looking Cloud asserts that the government portrayed the American Indian Movement as a violent organization so that the jury would associate violence with Looking Cloud, who was a member.

Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is admissible but may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice,

---

[3]John Graham was indicted along with Looking Cloud but has not been extradited from Canada and, thus, has not yet been tried.

confusion of the issues, or misleading the jury . . . ."  Evidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning.  Whether there was unfair prejudice depends on whether there was an "undue tendency to suggest decision on an improper basis." United States v. Sills, 120 F.3d 917, 920 (8th Cir. 1997) (citations omitted). Prejudicial evidence is not automatically excluded and we give great deference to the district court's balancing of the probative value and prejudicial impact of the evidence.  United States v. Ruiz, 412 F.3d 871, 881 (8th Cir. 2005).  We review the district court's decision to admit evidence for abuse of discretion.  Id. at 880. Looking Cloud objected to some, but not all, of the American Indian Movement evidence.  To the extent he failed to object, our review is for plain error.  See United States v. Sharpfish, 408 F.3d 507, 511 (8th Cir. 2005).

The government's theory of the case was that Aquash's murder was organized and executed by Movement members.  The government set out to prove that Looking Cloud received orders from decision-makers within the Movement to kill Aquash because she betrayed the Movement by becoming an informant.  The government offered two distinct types of evidence: (1) evidence that witnesses or the people discussed by the witnesses were members of the American Indian Movement and knew each other through that organization, and (2) evidence of the violent activities in which the Movement was involved.

The first type of evidence showed Looking Cloud's association with the Movement and its members.  This evidence is comparable to the admission of a defendant's association with a group or gang, who engage in violent activities.  We have admitted evidence of a defendant's association with a group where the association establishes motive or opportunity to commit the crime.  See Sills, 120 F.3d at 920.  Where a group plays a role in the crime the defendant is charged with, evidence of the nature and extent of the defendant's association with that group may

be necessary.  See, e.g., United States v. Johnson, 28 F.3d 1487, 1497 (8th Cir. 1994). However, a defendant cannot be convicted because of his association with a group. United States v. Lemon, 239 F.3d 968, 971-72 (8th Cir. 2001) (affirming admission of gang-related evidence because it did not become a "pervasive theme"); Johnson, 28 F.3d at 1497-98 (affirming admission of evidence that served to clarify connections between the defendants but did not serve as a substitute for linking the defendant to the crime).  In Sills and Johnson, we affirmed the district court's admission of gang-related evidence because although the evidence linked the defendants to a gang, it fell far short of encouraging the jury to base its verdict on guilt by association.  Sills, 120 F.3d at 920;  Johnson, 28 F.3d at 1497.

The murder of Aquash could only be explained within the context of the American Indian Movement and its activities.  Aquash and Looking Cloud were both members, as was virtually every person who came into contact with Aquash before her death.  Aquash was moved through a network of American Indian Movement members from Denver to Rapid City to Rosebud before she was killed.  The evidence showed how the members' preoccupation with Aquash escalated until her death.  The government introduced evidence that influential members of the Movement had concluded that Aquash was an informant, and that the Movement delegated the task of killing her to Looking Cloud, Clark, and Graham.  Evidence of how those who surrounded Aquash in the last months of her life were intimately involved with the Movement tended to make the government's theory--that the Movement orchestrated Aquash's murder--more probable.  Proof of Looking Cloud's involvement in the Movement was crucial to explain why he would have killed Aquash.

There was a low risk that, from evidence of mere membership in the Movement, the jury would associate violent activity with Looking Cloud. The evidence linked Looking Cloud to the American Indian Movement, but it did not encourage the jury to find him guilty because of his association with the Movement.

For the second type of evidence, Darlene Nichols testified as to several incidents of violence involving the American Indian Movement. Three of these, the riot in Custer involving several hundred people, the seventy-one day occupation of Wounded Knee, and a shoot-out near her home which killed two FBI agents, were the most violent events discussed and were also the least related to Aquash and Looking Cloud. In other words, evidence of these three events is the least probative and the most prejudicial.

Evidence of the activities engaged in by Movement members provided context for the Movement and showed how loyal and dedicated its members were, and how extensively involved they were in the Movement. The events mentioned by Nichols depicted a violent conflict between the Movement and the federal government. This conflict showed why the Movement would be enraged if one of its own members turned against it to become a government informant. This background information helped the jury understand why the Movement would go so far as to order the execution of a suspected government informant.

If any of the evidence of the violent acts involving the Movement was admitted in error, that error was harmless. An error is harmless "if, after reviewing the entire record, we determine that the substantial rights of the defendant were unaffected, and that the error did not influence or had only a slight influence on the verdict." United States v. Crenshaw, 359 F.3d 977, 1003-04 (8th Cir. 2004) (quoting United States v. Carroll, 207 F.3d 465, 470 (8th Cir. 2000)). These events were mentioned in passing by Nichols, and they did not become the focus of the trial. There was no in-depth discussion of the degree of violence or injuries caused by the events. The information was elicited in a matter-of-fact way and was not inflammatory. The jury would not have been unduly influenced by the evidence.

We hold that the district court neither abused its discretion nor committed plain error in admitting the evidence related to the American Indian Movement.

## II.

Looking Cloud's second evidentiary argument is that the district court erred in admitting evidence that Aquash was a government informant because it was inadmissible hearsay. The district court permitted several witnesses to testify that people within the American Indian Movement had accused Aquash of being an informant and that Aquash spoke of fearing for her life because of the accusations. The government concedes that Looking Cloud objected to the admission of most of the informant evidence and properly preserved those objections for appeal.

The district court sustained Looking Cloud's hearsay objection in part and gave the following limiting instruction to the jury:

> The requested testimony is hearsay, but I am going to admit it for a limited purpose only, this is a limiting instruction. It isn't admitted nor received for the truth of the matter stated. In other words, whether the rumor [that Aquash was an informant] is true or not. It is simply received as to what the rumor was. So it is limited to what the rumor was, it is not admitted for the truth of the statement as to whether the rumor was true or not. So with that limiting instruction, which in part grants the objection, but the objection beyond that is overruled.[4]

An out-of-court statement is not hearsay if it is not offered for the truth of the matter asserted. See Fed. R. Evid. 801(c).

---

[4]After that initial limiting instruction, upon subsequent objections, the district court would reiterate that the evidence was not admitted for the truth of the matter asserted.

Evidence that Aquash was rumored to be an informant was probative of Looking Cloud's motive to kill her. In United States v. Amahia, 825 F.2d 177 (8th Cir. 1987), a husband was indicted for conspiracy to enter into a fraudulent marriage in order to obtain an immigrant visa and permanent residency. We affirmed the district court's decision to admit evidence of a conversation where someone told the wife about the availability of cash for entering into bogus weddings with Nigerians. Id. at 179. The conversation was not offered for the truth of the matter asserted–to show that cash actually was available for entering into a fraudulent marriage–but to explain why the wife decided to marry her husband. Id. at 181. The conversation was admissible to "help the jury in understanding the context and circumstances" relating to the marriage. Id. In United States v. Cline, 570 F.2d 731, 734 (8th Cir. 1978), we affirmed the district court's decision to permit a witness to testify about a conversation between the defendant and the deceased victim that showed ill feelings between the two. Hostility between the suspected murderer and the victim provided a motive for the murder and helped the jury determine whether the murder was premeditated. Id.

Here, the evidence that Aquash was rumored to be an informant was not offered for the truth of the matter asserted. It was not important for the jury to determine whether Aquash was actually an informant. Rather, the rumor's value was in helping the jury understand Looking Cloud's alleged motive for killing her. It only mattered whether Looking Cloud had heard or believed that Aquash was an informant, not whether she was an informant. The informant rumors were therefore not hearsay and were relevant to Looking Cloud's guilt. The informant rumors helped the jury understand the context and circumstances of the murder.

In a related argument, Looking Cloud asserts that the district court erred by giving an improper limiting instruction to the jury on the informant evidence. A party cannot preserve a claim of instructional error for appellate review unless he makes a sufficiently precise objection and also proposes an alternate instruction. Caviness

v. Nucor-Yamato Steel Co., 105 F.3d 1216, 1220 (8th Cir. 1997).  Looking Cloud failed to offer a limiting instruction and we thus review for plain error.  See id.

The district court explained to the jury that the evidence  was not admitted for the truth of the matter stated.  The court admitted the evidence to show "what the rumor was" not "whether the rumor was true or not."  We reject Looking Cloud's bare allegation that this instruction was inadequate and unclear.  We hold that the district court's decision to admit the evidence of the rumor that Aquash was an informant was not an abuse of discretion and the court's admission of the evidence subject to a limiting instruction did not constitute plain error.

**III.**

Looking Cloud alleges that he received ineffective assistance of counsel because his attorney failed to (1) object to the admission of a videotaped interview on the ground that it violated Looking Cloud's Sixth Amendment rights, (2) object to inadmissible hearsay statements of Aquash and request a hearsay jury instruction, and (3) object to leading questions.

Ineffective assistance of counsel claims nearly always require the development of facts outside the record, which makes those claims generally inappropriate for direct appeal and better raised in a habeas proceeding.  See United States v. Santana, 150 F.3d 860, 863 (8th Cir. 1998).  We will not consider ineffective assistance of counsel claims on direct appeal except in "exceptional cases in which the district court has developed a record on the ineffectiveness issue or where the result would otherwise be a plain miscarriage of justice."  Id.

We decline to review Looking Cloud's claim because this is not such an exceptional case. One basis for Looking Cloud's ineffective assistance claim is that his attorney should have moved to suppress the police interview because Looking Cloud was intoxicated and therefore could not knowingly and intelligently waive his right to counsel. The only mention of alcohol in the record is in the video recording of the police interview. In that video, an agent asks Looking Cloud whether he is under the influence of any drugs or alcohol, to which Looking Cloud replies, "A little bit of alcohol." There is no further development of the issue in the record and thus no way for us to determine the merits of Looking Cloud's argument. We decline to rule on Looking Cloud's ineffectiveness claims in this appeal, but he may raise them in a proceeding brought under 28 U.S.C. § 2255.

## IV.

Looking Cloud's final argument is that the evidence at trial was not sufficient to support his conviction and the district court erred in rejecting his motion for judgment of acquittal. The jury convicted Looking Cloud of first degree murder or of aiding and abetting that murder under 18 U.S.C. §§ 1111 and 1153. The elements Looking Cloud disputes are (1) that he killed or aided and abetted in the killing of Aquash; (2) that he did so with malice aforethought; and (3) that the killing was premeditated.

We review the sufficiency of the evidence de novo and will reverse a conviction only if, after viewing the evidence in the light most favorable to the jury's verdict and giving the government the benefit of all reasonable inferences that may be drawn from the evidence, no construction of the evidence will support the jury's verdict. See United States v. Simon, 376 F.3d 806, 808 (8th Cir. 2004). Either direct or circumstantial evidence may provide a basis for conviction; adducing direct evidence at trial is not a requirement. Id.

The evidence adduced at trial was as follows. The testimony established that nearly twenty members of the American Indian Movement suspected Aquash was an informant or had at least heard the rumor.[5] Darlene Nichols, who joined the Movement in 1972 and had been an active member, testified that several members, one of whom had already threatened Aquash's life because he suspected she was an informant, took Aquash away for weeks to "watch her." Nichols said that Aquash was constantly watched, was not allowed to go anywhere alone, and was not permitted to go home despite her requests to do so. Mathalene White Bear, another former member who provided shelter to Aquash in 1975, testified that Aquash believed her life was in danger as early as September of that year.

In November 1975, Aquash left Pierre and went to Denver, where she stayed in the home of a Movement member. Other Movement members frequently gathered at this house. Several members held a meeting at the house in November 1975 because they had received a phone call saying that Aquash was an informant and needed to be taken to Rapid City, South Dakota. The group decided Looking Cloud, Clark, and Graham would take Aquash to Rapid City. Janis testified that those three carried Aquash to the car against her will, crying; her wrists were bound and she was tied to a board and unable to walk on her own. They put her in the back end of a hatch-back Pinto and drove to Rapid City. After meeting with more American Indian

---

[5]Darlene Nichols testified that Leonard Crow Dog and Leonard Peltier thought Aquash was an informant, and that Nichols, her daughter, and Dennis Banks, heard Peltier say he thought Aquash was an informant. Mathalene White Bear and Troy Lynn Yellow Wood testified that Aquash told them of the accusations. Angie Janis testified that Thelma Rios said Aquash was an informant and that the rumor was discussed at a meeting attended by Yellow Wood, John Graham, George Palfey, Ernesto Vijil, and possibly Looking Cloud. Denise Pictou, Aquash's daughter, testified that Looking Cloud told her and her sister about the rumor. Richard Two Elk also testified that Looking Cloud discussed the allegations with him. Candy Hamilton and Cleo Gates testified to hearing the rumor. Trudell testified that Aquash and Looking Cloud told him of the accusations.

Movement members at the Wounded Knee Legal Defense/Offense Committee house in Rapid City, they drove Aquash to Rosebud. Yellow Wood said that Looking Cloud stayed with Aquash in the car while Graham and Clark went into a house. There, Aquash begged to be let go and told Looking Cloud that the others were inside deciding her fate and were probably going to make him pull the trigger. John Trudell, chairman of the American Indian Movement from 1973-1979, testified that Looking Cloud, Graham, and Clark were not decision-makers for the American Indian Movement, and that the group did not make but rather received orders to kill Aquash before they left the house in Rosebud. The jury could reasonably infer from Looking Cloud's participation in carrying Aquash out to the car, tied to a board, that he knew they were going to kill her. In further support of that inference was evidence that Aquash also knew in advance that she was going to be killed. Aquash mailed a ring back to White Bear before she died; it was a signal the two friends had previously arranged so White Bear would know something had happened to Aquash.

Trudell testified that Looking Cloud told him that when Graham and Clark returned to the car for the last time, Aquash cried and begged them not to kill her. They drove to an area near Wanblee and parked the car. Yellow Wood testified that Looking Cloud told him that Aquash continued to cry, pray, and beg for her life as they forced her out of the car and marched her up the hill to a cliff. Two Elk testified that Looking Cloud told him he handed a gun to Graham and nodded at him. Aquash knelt to the ground, possibly to pray, and Graham held the gun to the back of her head and pulled the trigger. Afterwards, the three buried the gun under a bridge nearby.

From the testimony, the jury could reasonably infer that from the time the car left the house in Rosebud, Looking Cloud understood that the plan was to kill Aquash. Although Looking Cloud told others that Graham pulled the trigger, and the government introduced no evidence to the contrary, the jury could at least reasonably believe that Looking Cloud helped force Aquash out of the car and up the hill and that he assisted in the murder by handing the gun to Graham to shoot and kill Aquash.

-12-

This constitutes sufficient evidence to support the jury's finding that Looking Cloud killed or aided and abetted in the killing of Aquash, with malice aforethought, and that the killing was premeditated.

We affirm the district court's judgment of conviction.

_____