STATE of Minnesota, Respondent,

v.

Ronald Lindsey REED, Appellant.

No. A06–1033.

Supreme Court of Minnesota.

Aug. 23, 2007.

---

577

Melissa Sheridan, Assistant State Public Defender, Eagan, MN, Lawrence Hammerling, Deputy State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, Jeanne L. Schleh, Assistant Ramsey County Attorney, St. Paul, MN, for Respondent.

OPINION

ANDERSON, G. Barry, Justice.

Ronald Reed was convicted of first-degree murder and conspiracy to commit first-degree murder for the 1970 shooting of St. Paul police officer James Sackett. On appeal, Reed raises 13 claims of error through counsel and in a pro se brief. We hold that none of the asserted errors requires reversal.

St. Paul police officer James Sackett was shot and killed while responding to a false emergency call on May 22, 1970. Shortly after midnight, a woman called the police to request a ride to the hospital for a woman in labor at 859 Hague Avenue in St. Paul. Sackett and his partner Glen Kothe were dispatched to 859 Hague and parked in front of the residence.

After Sackett knocked on the front door and received no response, Kothe walked to the back door and knocked on it. He heard a dog bark inside, and as he leaned over the back railing to warn Sackett about the dog, he heard a loud bang and saw a bright flash from the direction of the intersection in front of the house. Kothe heard a scream, and when he ran to the front of the house he discovered that Sackett had been shot. Kothe sought cover behind his squad car and radioed for assistance. Sackett was pronounced dead at the hospital as a result of a gunshot wound to the chest.

The ensuing investigation revealed that the shot that killed Officer Sackett did not come from inside 859 Hague and that no one there had called the police or been involved in the shooting. No weapon or shell casing was found in the area. The phone call was traced to a phone booth at Selby Avenue and Victoria Street. Further investigation and voice printing identified the caller as Constance Trimble (now Smith), Ronald Reed's girlfriend and mother to his child.

Trimble–Smith was indicted, tried, and acquitted of Officer Sackett's killing in 1972. She testified at her trial that she had been instructed to make the false emergency call as a pre-arranged signal to the St. Paul police to proceed to 859 Hague and bust Gerald Starling, an associate of Trimble–Smith and Reed, for possession of drugs. She denied knowledge of a plan to shoot a police officer. After her acquittal, Trimble–Smith was held in contempt of court and jailed for 25 days for refusing to disclose who told her to make the phone call. Trimble–Smith was the only person charged in Officer Sackett's death until 2005.

Ronald Reed was arrested on November 13, 1970, on an unrelated warrant. In his possession police found weapons and detailed plans for an airplane hijacking and hostage plot designed to win the release of Trimble–Smith, Larry Clark, and another individual from jail. Reed was later charged and convicted of an attempted bank robbery that took place in Omaha, Nebraska, on October 20, 1970. *State v. Reed*, 188 Neb. 815, 199 N.W.2d 707 (1972).

In 2002, the police re-opened the investigation into Officer Sackett's killing. Based on newly discovered evidence, Reed and Clark were indicted together for aiding and abetting each other and for conspiring with each other to kill Officer Sackett. The two cases proceeded together through pretrial proceedings until the state agreed to Reed and Clark's request for severance. Reed was tried first. Trimble–Smith testified that Reed drove her to the phone booth on May 22, 1970, directed her to make the 911 call, and told her what to say. She also told investigators and testified that after making the call, she and Reed went directly to Clark's

residence at 882 Hague. Clark's residence is 102 yards from 859 Hague, where Officer Sackett was shot. Trimble–Smith and Reed remained at Clark's residence for five to seven minutes before going home. Their presence thus coincided with Sackett's shooting roughly 100 yards away.

Joseph Garrett testified that several days before the murder, St. Paul police made a traffic stop and confiscated a gun found in his possession. After a discussion, Garrett told the police officers to "watch the rooftops." Garrett was apprehended and questioned about this remark hours after Officer Sackett's killing. He told police that his "watch the rooftops" comment was a general comment made in anger and that he knew nothing about the killing. He was never a suspect in Officer Sackett's murder. Garrett provided no further information until the summer of 2005, when he told investigators that Reed attempted to recruit him in 1970 to help in "bringing down the first pig," which Garrett understood to mean killing a police officer. Garrett testified that he told Reed he would think about it and would let him know. He testified that he avoided Reed after that encounter and that he did not tell police about Reed's proposal earlier because he feared for his life. Garrett also testified that he and Reed were part of an organization called the Black United Front, at the meetings of which Reed advocated protecting "the community" from the police by whatever means necessary, including killing.

Donald Walker testified that in 1969 he attended meetings of the Inner City Youth League at which Reed and Clark would voice "hate talk about the government, the police, and the White Establishment." He also testified that on two occasions he transported a rifle for Reed and Clark in the trunk of his car. Walker, who was familiar with guns from his military ser-vice, testified that the rifle was a single-shot, bolt-action rifle larger than .22–caliber. Forensics determined that Officer Sackett was probably killed with a large caliber single-shot, bolt-action rifle.

John Griffin was involved in the Black Panther movement in the late 1960's. He testified that Reed advocated killing a police officer to put St. Paul "on the map" and possibly to get an official Black Panther chapter. Griffin also testified that at an encounter in the early 1980's Reed told Griffin that "when [Reed] put a bead on that officer * * * he felt powerful," but "when he seen the bullet hitting him, he said he never felt more fucked up in his life."

A jury convicted Reed of first-degree murder and conspiracy to commit first-degree murder, and this appeal followed. Reed raises six issues through his counsel and an additional seven issues in his pro se brief. We address each in turn.

## I.

■ Reed argues that the district court erred in overruling his objection to the court's subject matter jurisdiction. Reed asserts that under the law as it stood in 1970, the juvenile court had exclusive original jurisdiction over a 19–year–old who committed an offense.

Under the law as of May 1970, the juvenile court had "original and exclusive jurisdiction in proceedings concerning any child who is alleged to be delinquent, a juvenile traffic offender, neglected, or dependent, and in proceedings concerning any minor alleged to have been a delinquent or a juvenile traffic offender prior to having become eighteen years of age." Minn. Stat. § 260.111, subd. 1 (1969). A "child" was defined as an individual under 18 years of age. Minn.Stat. § 260.015, subd. 2 (1969). A "minor" was defined as an individual under 21 years of age. Minn.

Stat. § 260.015, subd. 9 (1969). Thus, there were two situations in which the juvenile court had exclusive jurisdiction: when an individual under 18 was alleged to be delinquent and when an individual under 21 was alleged to have been delinquent before turning 18. Reed was not subject to the juvenile court's exclusive jurisdiction under either prong of section 260.111, subd. 1, because he was over 18 at the time of the offense.[1] The district court therefore properly overruled Reed's objection to the court's subject matter jurisdiction.

## II.

■ Reed argues that the district court erred in instructing the jury that it was not required to find that Reed aided and abetted or conspired with Clark. The grand jury indicted Reed and Clark for aiding and abetting one another and conspiring together to kill Officer Sackett. The state did not move to amend the indictment to include unnamed accomplices or co-conspirators.[2] Over Reed's objection, the district court instructed the jury on Count One that the state needed to prove beyond a reasonable doubt that "the defendant, or someone being aided and abetted by the defendant, caused the death of James Sackett." The court added that Reed was guilty if he "aided, advised, hired, counseled or conspired with another or otherwise procured the commission of a crime by another person, whether or not that person is named in the indictment or even identified." On Count Two, the court instructed the jury, again over Reed's objection, that the state needed to prove that Reed "conspired with at least one other person to commit the crime of murder in the first degree. It makes no difference

whether that person is named in the indictment. You do not have to find that the other person charged in the indictment was a member of the conspiracy." The jury returned general verdicts finding Reed guilty of aiding and abetting murder in the first degree and conspiring to commit murder in the first degree.

Reed argues that because he was indicted for aiding and abetting and conspiring with Clark, the state was required to prove, as an essential element of the offense, that Clark was Reed's co-conspirator and accomplice. Reed relies exclusively on a Rhode Island case for the proposition that the identity of an aider and abettor or co-conspirator named in an indictment becomes an essential element of the offense. *See State v. DeSanto*, 603 A.2d 744, 746 (R.I.1992) ("When, as here, the information specifically alleges that only two named persons conspired the identity of those two individuals becomes an essential element of the offense."). *DeSanto* is neither binding on this court nor persuasive, for the Rhode Island court simply stated its conclusion without reasoning or authority. *DeSanto* has not been followed or cited by any court, including the Rhode Island Supreme Court, in the 15 years since its publication.

A court "may permit an indictment or complaint to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." Minn. R.Crim. P. 17.05. While no formal amendment was made here, the charge to the jury was the same as it would have been with such an amendment. The instructions did not add any new or

---

**1.** Reed was born on August 31, 1950, and was 19 on May 22, 1970, the date of Officer Sackett's murder.

**2.** The state did move to amend the dates of the conspiracy alleged in the indictment, and the district court granted the motion. Reed does not challenge that amendment in this appeal.

different offenses, and Reed did not adequately explain, in his brief or in response to questioning at oral argument, how the jury instructions caused him any prejudice. The state's case emphasized Reed's motives, opportunity, and behavior. The only necessary connection to Clark was that Reed and Trimble–Smith went to his house after the 911 call.[3] Reed's only defense was to impeach the memory and credibility of the state's witnesses. We cannot see how his defense would have changed had the indictment included unnamed co-conspirators from the outset. *See State v. Lucas,* 372 N.W.2d 731, 739 (Minn.1985) (holding that use of the word "co-conspirator," rather than the name of the co-conspirator identified in the indictment, in jury instructions was an "insignificant [change] that could not have prejudiced defendant").

■ It is preferable for a district court to require a formal motion from the state before amending an indictment. This ensures that an adequate record of the reasons for, and objections to, the amendment is preserved. Nonetheless, the district court would have been within its discretion to amend the indictment, and Reed has not shown that the instructions caused him any prejudice. On these facts, we cannot conclude that the district court's jury instructions constitute reversible error.

### III.

■ Reed argues that the evidence presented at trial was insufficient as a matter of law to support his convictions. The state bears the burden of proving guilt beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). On appeal, the reviewing court must determine whether there was sufficient evidence to justify a finding of guilt beyond a reasonable doubt by a rational trier of fact. *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). For a jury to convict a defendant on circumstantial evidence alone, the circumstances must form a "complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Bias,* 419 N.W.2d 480, 484 (Minn.1988) (internal quotation marks omitted). Evidence must be viewed in the light most favorable to the state. *State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981). Therefore, a defendant who requests a reviewing court to reverse the factual findings of a jury bears a heavy burden. *State v. Strimling,* 265 N.W.2d 423, 428 (Minn. 1978).

One who "causes the death of a human being with premeditation and with intent to effect the death of the person or of another" is guilty of murder in the first degree. Minn.Stat. § 609.185(a)(1) (2006). "A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05, subd. 1 (2006). "Whoever conspires with another to commit [first-degree murder] and in furtherance of the conspiracy one or more of the parties does some overt act in furtherance of such conspiracy may be sentenced [to] * * * imprisonment for not more than 20 years * * *." Minn. Stat. § 609.175, subd. 2 (2006). Because Reed was charged with aiding and abetting and conspiracy, the state was not required to prove that Reed was directly

---

3. We also note that the indictment and early proceedings in this matter contemplated a joint trial between Reed and Clark, and it was at Reed's request that separate trials were ordered.

involved in firing the shot that killed Sackett.

The evidence presented by the state included: Reed's advocacy, at meetings of the Black United Front and Inner City Youth League, of killing police officers; evidence that members of these organizations practiced shooting at silhouettes that looked like police officers; evidence that Reed and Clark possessed and transported a bolt-action rifle of the type used to murder Officer Sackett; evidence that Reed approached Joseph Garrett a week before the murder and attempted to recruit him for "bringing down the first pig"; Trimble–Smith's uncontradicted testimony that Reed prompted her to make the 911 call and travel to Clark's residence, approximately 100 yards from where Sackett was shot; and Reed's confession to John Griffin. Taken together, this evidence would justify a reasonable jury in convicting Reed.

### IV.

Reed argues that the district court erred in failing to give an accomplice corroboration instruction to the jury regarding Trimble–Smith's testimony. Reed neither requested such an instruction nor objected to its omission. The state disputes that Trimble–Smith was Reed's accomplice and asserts that the omission was harmless in any event.

A conviction "cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Minn.Stat. § 634.04 (2006). Although Reed did not request an accomplice instruction, "trial courts have a duty to instruct juries on accomplice testimony in any criminal case in which it is reasonable to consider any witness against the defendant to be an accomplice." *State v. Strommen,* 648 N.W.2d 681, 689 (Minn.2002). Accomplice testimony is inherently untrustworthy because the accomplice may testify against the defendant in the hopes of obtaining clemency for himself. *State v. Sorg,* 275 Minn. 1, 5, 144 N.W.2d 783, 786 (1966). To determine whether the omission of the instruction requires reversal, we must ask whether Trimble–Smith was Reed's accomplice, and if so, whether the omission was plain error that we may review.

### Was Trimble–Smith an accomplice?

Generally, the "test for determining whether a witness is an accomplice for purposes of section 634.04 is whether he could have been indicted and convicted for the crime with which the accused is charged." *State v. Lee,* 683 N.W.2d 309, 314 (Minn.2004) (internal quotation marks omitted). When it is unclear whether a witness is an accomplice or not, it generally becomes a question of fact for the jury to decide. *State v. Gail,* 713 N.W.2d 851, 863 (Minn.2006). The precise question of whether Trimble–Smith can be considered Reed's accomplice in light of her earlier trial and acquittal, however, is a question of law.

Trimble–Smith was indicted and charged with first-degree murder in connection with Officer Sackett's death. *State ex rel. Trimble v. Hedman,* 291 Minn. 442, 444, 192 N.W.2d 432, 434 (1971). She was tried and acquitted. Reed asserts that the mere fact that he and Trimble–Smith were each charged with the same crime establishes that she is an accomplice, but we are not persuaded by this conclusory assertion. An acquittal of a crime is a bar to further prosecution of any included offense. Minn.Stat. § 609.04, subd. 2 (2006). Trimble–Smith therefore can no longer fear

prosecution by the state for first-degree murder. Furthermore, there is no separate criminal liability for a crime committed by another person, *State v. Britt,* 279 Minn. 260, 263, 156 N.W.2d 261, 263 (1968), so she need not fear prosecution for aiding and abetting Sackett's killer. It follows that the state could not influence Trimble–Smith's testimony with promises of leniency in relation to those charges.

Conspiracy to commit murder, however, is not a lesser included offense of first-degree murder. *Lucas,* 372 N.W.2d at 740–41. Thus, Trimble–Smith could theoretically be charged with conspiracy to commit murder, the same crime of which Reed has been convicted. Trimble–Smith also testified that she received a letter in December of 2005 granting her immunity from federal prosecution. It is not clear what federal prosecution she could have faced or if this letter was related in any way to the state's investigation. Nevertheless, the fact that Trimble–Smith could, in theory, still be charged with the same offense of which Reed was convicted indicates that she could reasonably be considered an accomplice, and the grant of federal immunity further implicates the concern for integrity of testimony that underlies the accomplice instruction. We conclude that the district court's failure to give the accomplice testimony instruction was error and now turn to consider whether the error is subject to our review.

*Was the failure to give the instruction plain error?*

■■■■ Reed did not request an accomplice instruction or object to the district court's failure to give one. The plain error analysis allows an appellate court to consider unobjected-to error that affects a criminal defendant's "substantial rights." *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). This analysis involves consideration of four factors. The first three

factors are expressly articulated in Minn. R.Crim. P. 31.02 (providing that "[p]lain errors or defects affecting substantial rights may be considered by the court * * * although they were not brought to the attention of the trial court"). Under the first three factors there must be: (1) an error, (2) that was plain, and (3) that affected the defendant's substantial rights. *State v. Ramey,* 721 N.W.2d 294, 298 (Minn.2006). If these three factors are satisfied, the appellate court then considers the fourth factor: whether the error should be addressed "to ensure fairness and the integrity of the judicial proceedings." *Id.* (quoting *Griller,* 583 N.W.2d at 740).

■■■■ We have already established that the first factor of the plain error analysis, whether there was error, has been satisfied. Under the second factor, an error is "plain" if it was "clear" or "obvious." *Strommen,* 648 N.W.2d at 688 (citing *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), and *State v. Ihle,* 640 N.W.2d 910, 917 (Minn. 2002)). "Usually [clear or obvious error] is shown if the error contravenes case law, a rule, or a standard of conduct." *Ramey,* 721 N.W.2d at 302.

■■■■ The "affects substantial rights" language of the third plain error factor is the same language used to define harmless error. *See* Minn. R.Crim. P. 31.01 (stating that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded"), quoted in *Santiago v. State,* 644 N.W.2d 425, 450 (Minn.2002). Under the third plain error factor, an error affects substantial rights where there is a "reasonable likelihood" that the absence of the error would have had a "significant effect" on the jury's verdict. *See State v. MacLennan,* 702 N.W.2d 219, 236 (Minn.2005). Unlike a harmless error analysis, the defendant

generally bears the burden of persuasion with respect to the third plain error factor. *See Olano,* 507 U.S. at 734, 113 S.Ct. 1770; *Ramey,* 721 N.W.2d at 301–02 (explaining that except in the case of prosecutorial misconduct, a defendant bears the burden of showing that the error affected a substantial right); 3B Charles Alan Wright, Nancy J. King & Susan R. Klein, *Federal Practice and Procedure* § 856 (3d ed.2004).[4]

■ If an appellate court finds that the first three prongs of plain error analysis have been met, it then considers the fourth factor: whether the unobjected-to error should be addressed to ensure fairness and integrity of the judicial process. *Ramey,* 721 N.W.2d at 302. We have declined to grant a defendant a new trial where the unobjected-to error did not seriously affect "the fairness, integrity or public reputation of judicial proceedings." *Griller,* 583 N.W.2d at 742 (quoting *Johnson v. United States,* 520 U.S. 461, 469, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)) (explaining that it would be a miscarriage of justice to grant the defendant a new trial).

Because Reed did not request, or object to the omission of, the accomplice corroboration instruction, the issue is whether the omission requires reversal under plain error analysis. Because the instruction is required by our caselaw, *see Strommen,*

648 N.W.2d at 689, the failure to give it was plain error. But because the concerns underlying the accomplice corroboration instruction were largely mitigated at trial, we conclude that Reed has not carried his burden, under the third prong of plain error analysis, of showing that absence of the error would have had a significant effect on the verdict.

Corroborative evidence need not, standing alone, be sufficient to support a conviction, but it must "affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree." *Sorg,* 144 N.W.2d at 786. "Circumstantial evidence indicating the defendant's participation in the crime is sufficient to corroborate the accomplice's testimony." *State v. Bowles,* 530 N.W.2d 521, 532 (Minn.1995) (citing *State v. Jones,* 347 N.W.2d 796, 800 (Minn. 1984)). Trimble–Smith's testimony about Reed's involvement with the Inner City Youth League and his association with some of its other members was generally corroborated and established a motive for Reed to bring about the death of a police officer. Joseph Garrett testified that Reed advocated defending the community from the police "by whatever means necessary," which he interpreted to include killing, and that Reed invited him to "be involved in getting our first pig." Antho-

---

4. In *Gail,* 713 N.W.2d at 863–64, and *Lee,* 683 N.W.2d at 316, we applied harmless error review to a district court's failure to give an accomplice corroboration instruction sua sponte. In *Lee,* we applied harmless error analysis, citing *State v. Shoop,* 441 N.W.2d 475, 480 (Minn.1989), and concluded that the duty to give an accomplice corroboration instruction applies regardless of whether defendant requests it. 683 N.W.2d at 316. In *Gail,* we noted that we could not grant defendant relief under either a plain error or a harmless error standard. 713 N.W.2d at 863 n. 9. We clarify today that where a district court fails to give a required accomplice cor-

roboration instruction and the defendant does not object, an appellate court must apply the plain error analysis. Although a plain error analysis includes the equivalent of a harmless error inquiry in its third factor, a plain error analysis requires consideration of a fourth factor, specifically, whether correction of the unobjected-to error is required to ensure fairness and integrity of the judicial process. The court of appeals' decision in *State v. Moon,* 717 N.W.2d 429 (Minn.App.2006), holding that harmless error analysis applies to a district court's failure to give the accomplice corroboration instruction sua sponte, is overruled.

ny Foster testified that Reed commented, "[t]hey [the police] are killing us, so we have to kill them." John Griffin and Foster both testified that Reed noted that killing a police officer could put St. Paul "on the map" and potentially get the city a Black Panther chapter. Testimony by these witnesses also established a close association between Reed and Clark, whose house was 100 yards from the scene of Officer Sackett's shooting. Foster further testified that, a few days after Officer Sackett's shooting, he asked Reed and two other friends "[d]id you hear about the police officer that got killed"? According to Foster, Reed remained silent while another friend advised Foster to "drop it" because "we don't want to go there." Donald Walker testified that Reed possessed a rifle of the type used to shoot Officer Sackett. Evidence of Reed's arrest in 1970 with weapons and detailed plans for a hijacking plot designed to free Trimble–Smith and Clark from jail also supported the inference that Reed was involved in the killing. Finally, Griffin testified that Reed confessed to the killing. While Reed challenges the credibility of each witness for a variety of reasons, the weight of their collective testimony was sufficient to corroborate Trimble–Smith's testimony.

Trimble–Smith, furthermore, insisted that both she and Reed had been duped into making the call and that neither knew that a police officer would be shot. She also testified, contrary to her grand jury testimony, that neither Reed nor Clark could have left Clark's house in the short time they were there, precluding the possibility that either man left the house to shoot Officer Sackett. Her efforts to absolve Reed of complicity in the shooting belie the suggestion that she was a pawn of the state.

Given the extent of the corroborating evidence in the record and Trimble–Smith's testimony taken as a whole, we find that the omission of the accomplice corroboration instruction does not fall within the plain error scope of review because it did not affect Reed's substantial rights.

V.

 Reed contends that the district court's failure to instruct the jury about the limited purpose for which evidence of Reed's "other bad acts" was admitted constitutes reversible error. Reed points to the admission of evidence of the guns and notes found with him when he was arrested in 1970, and of his extremist beliefs and desire to be affiliated with the national Black Panther organization. Reed concedes that he did not request a limiting instruction but contends that failure to give the instruction sua sponte constitutes plain error warranting a new trial.

 "[W]here two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other * * * [evidence of the other offense] is admissible." *State v. Wofford*, 262 Minn. 112, 118, 114 N.W.2d 267, 271 (1962). "Such evidence may be considered only for the purpose for which it is sought to be introduced, regardless of the fact that it may incidentally show commission of some other offense." *Id.* Evidence of a defendant's association with a group is admissible where the association establishes motive or opportunity to commit the crime. *United States v. Looking Cloud*, 419 F.3d 781, 786 (8th Cir.2005).

The state's theory at trial was that the guns and notes found with Reed when he was arrested were part of the conspiracy to kill a police officer and gain publicity, during which Reed planned to free Clark

and Trimble–Smith. The evidence of which Reed complains, whether or not evidence of criminality by itself, was directly related to the conspiracy alleged by the state. *See State v. Hogan,* 297 Minn. 430, 434–35, 212 N.W.2d 664, 668 (1973) (noting that evidence of a scheme or plan was "inextricably bound together" with evidence of the immediate episode of the crime charged). The description of Reed's political beliefs was evidence that Reed had a motive to kill a police officer. In addition, a review of the transcript portions complained of by Reed reveals that the prosecution mentioned the guns, notes, and organizations only to link Reed to Officer Sackett's killing, not to prejudice the jury. The failure to give the unrequested instruction was not plain error.

## VI.

■ Reed contends that the district court committed reversible error by replaying Trimble–Smith's 911 call to the jury during deliberations because the replay "unduly emphasized a critical piece of evidence." Reed argues that because the jury asked to hear the call (which they had already heard three times),[5] but asked for no other evidence or testimony, the jury "show[ed] they were determined to give undue weight to this one piece of evidence despite the court's caution" and that the court thus abused its discretion by replaying the call. Reed alleges that the error was harmful because the jury's request to hear the tape indicated that "they were unsure of what had occurred" and because they did not rehear any other evidence.

■ We review a trial court's evidentiary rulings for abuse of discretion. *State v. Kendell,* 723 N.W.2d 597, 612 (Minn.2006). A jury may request review of testimony or other evidence after it has

retired to deliberate, and the court has discretion to grant the request. Minn. R.Crim. P. 26.03, subd. 19(2). Even where evidence is admitted in error, harmless error review applies. *State v. Courtney,* 696 N.W.2d 73, 79–80 (Minn.2005). "An error is harmless beyond a reasonable doubt if the guilty verdict actually rendered was surely unattributable to the error." *Id.* at 80 (internal quotation marks omitted).

The tape of the 911 call was received as evidence and played for the jury three times during the trial. On the jury's second day of deliberation, it requested to hear the tape again and did so in the presence of Reed and both counsel. Reed objected to this fourth playing. The court allowed the tape to be played with this warning:

> I want to make sure that the jury does not take this out of context. This is a piece of evidence that you have a right to listen to, but that [sic] you need to listen to it in the context of all of the other evidence that's been presented in the case.

■ The jury is permitted to choose which evidence it will re-examine. If the jury was "unsure of what had occurred" as Reed asserts, it was proper for the jury to listen to the tape to inform itself of what occurred. It is also not clear what "undue weight" Reed believes the tape could have, as it does not contain Reed's voice or mention his name. The district court, furthermore, gave an appropriate cautionary instruction. Our observations in *State v. Kraushaar* are apt here: "at worst, the replaying of the tape allowed the jury to rehear what it had already heard," and "it is extremely unlikely that the replaying of the tape by the jury affected the verdict as

5. Reed asserts in his brief that the jury had already heard the tape four times. Based on

our review of the record, the tape had only been played three times.

by prompting the jury to convict where it otherwise would not have done so." 470 N.W.2d 509, 516 (Minn.1991). The district court did not abuse its discretion.

## VII.

Reed raises seven issues in his pro se brief for our review. We hold that none of the alleged errors requires reversal.

### Grand Jury Testimony of John Griffin

■ Reed contends that the district court erred in denying his motion to dismiss the indictments against him because the prosecution failed to disclose exculpatory evidence to the jury. Reed asserts that the prosecution allowed John Griffin to testify to the grand jury that Reed ordered him to kidnap Kelly Day to prevent him from testifying at Trimble–Smith's trial, but that this testimony was false because Day was in police custody at the time.

■ A defendant in a criminal proceeding bears a heavy burden when seeking to overturn an indictment, and it is a rare case where an indictment will be invalidated. *State v. Moore*, 438 N.W.2d 101, 104 (Minn.1989). The record before this court does not contain a transcript of the grand jury proceedings, but assuming Reed's account is accurate, evidence that Kelly Day was in police custody is only remotely related to Reed's involvement in Officer Sackett's killing and is not exculpatory. Also, Reed has not asserted that he knew Day was in custody or believed it was impossible to kidnap him, so even if we were satisfied that Day was in custody at the time in question it would not necessarily render Griffin's testimony false. It is extremely unlikely that Griffin's testimony about Day affected the grand jury's decision to indict, and it is equally unlikely that the grand jury would have reached a different decision if it were informed that Kelly Day was not in a position to be kidnapped. The district court did not err in refusing to dismiss the indictments.

### Motion to Appoint Substitute Counsel

■ Reed argues that the district court erred by refusing to afford him a hearing on his motion to represent himself. This is a mischaracterization of the record, as Reed's motion was to appoint substitute counsel, not to represent himself. The district court denied this motion as groundless and untimely, finding that Reed's counsel was competent, prepared, and zealous. The district court also denied Reed's request to read his motion into the record, but ordered that Reed's written request be made a part of the court file. Reed then refused to participate in the trial and left the courtroom. Reed later returned and was present throughout the rest of the trial.

■ A defendant has a right to demand new counsel, but "the right of an indigent to have counsel does not give him the unbridled right to be represented by counsel of his own choosing. * * * Although he may ask for a substitution, his request will be granted only if exceptional circumstances exist and the demand seems reasonable." *State v. Fagerstrom*, 286 Minn. 295, 299, 176 N.W.2d 261, 264 (1970). "A defendant may not obtain a continuance by discharging his counsel for purposes of delay or by arbitrarily choosing to substitute counsel at the time of trial." *Id.*

The district court's finding that Reed's counsel was adequate was not erroneous. Reed makes no showing that his counsel was inadequate. For example, while Reed claimed in his motion that "[my attorney] has not met with me more than 6 times" during his entire detention, Reed's inmate visitor log indicates that Reed's counsel visited Reed 22 times between March 2005 and February 2006. Reed also com-

plained, *inter alia,* that on the eve of trial he was "in the dark as to the strategy to be used in [his] case" and that "[my attorney] has not partnered with me in preparing my defense." The 22 visits with Reed suggest otherwise, but even if Reed was genuinely dissatisfied with his counsel he offered no excuse for delaying his request until the morning of trial. Reed's motion was a transparent effort to delay his trial and was properly denied.

### Deterred from Testifying

■ Reed asserts that the prosecution acted improperly by deterring him from testifying with the threat of introducing a prior conviction. Reed refers to his conviction for an attempted bank robbery in Omaha that occurred less than six months after Officer Sackett's murder. Evidentiary rulings rest within the trial court's discretion and will not be reversed absent a clear abuse of discretion. *State v. Grayson,* 546 N.W.2d 731, 736 (Minn.1996).

The state did not seek to introduce evidence of this conviction during its case-in-chief. At the conclusion of its case, the state informed the court that it reserved the right to offer the conviction to rebut Reed's defense. The state suggested that the conviction was admissible to show Reed's intent in prompting the 911 call and to impeach Reed's character if he put it in issue. Reed did not respond, but he reserved his right to argue that the conviction was inadmissible "at the appropriate time." The district court mused briefly on the requirements for *Spreigl* evidence and then stated, "I don't know that it would come in—and I am just thinking out loud here—I don't know that it would necessarily come in as *Spreigl* evidence in the normal way that *Spreigl* evidence is offered, but may come in as—in another form." The court did not rule, and Reed did not ask it to rule, on the admissibility of the conviction.

On the next day of trial, before the jury was called in, Reed informed the court, "under extreme duress, I am inclined to waive my right to testify in my behalf." The court asked him to clarify that he was making the decision of his own accord without pressure from anyone. Reed repeated that "[u]nder extreme duress" he was "inclined to waive" his right to testify and went on to explain,

it is my understanding that it is the position of the court that if I were to proceed with my defense, that * * * this court would allow the prosecution to then impeach my testimony by introducing into evidence a 25 or 35 year old conviction. That's my understanding. That if I were to testify or if any of my witnesses were to testify. So the courts [sic], I feel, is placing an albatross around my neck. That if I testify, that the state would then be able to introduce a 35–year old conviction.

The court then clarified,

I have indicated that that conviction is stale and that I would not allow the state to cross-examine the defendant using that conviction.

On the other hand, I did indicate to counsel in chambers that in the event that the defendant were to put his character into evidence that, although I have not made a decision as to the *Spreigl* issue, that if the defendant's character were put into evidence, that there would be a stronger likelihood that it would be appropriate to allow the *Spreigl* evidence. But, again, I indicated to your attorney that I have not made a decision, that I would be leaning in that direction, but that I would want to hear what evidence the defense presents in its case in chief. And that's the way I left it with counsel and I want the record to be clear on that.

The court then asked both attorneys whether it had accurately summarized the discussion in chambers. Reed's attorney stated, "I believe the message was that it was a strong likelihood the *Spreigl* would come in." The prosecutor stated that the court had "indicated that it would come in not only on the character question, but on the question of intent and absence of mistake or lack of knowledge."

The district court adequately explained to Reed that it had not decided whether or not the conviction would be admitted. The court simply reserved its decision on the issue until it heard Reed's case-in-chief. Reed cannot challenge the district court's ruling on the admissibility of the conviction, as the court made no such ruling. We will therefore treat Reed's challenge as one to the district court's reservation of its ruling on the conviction until it heard Reed's case-in-chief.

Because Reed did not object to the reservation of the ruling, we apply plain error analysis to determine whether we may properly review the alleged error. As noted above, in plain error analysis we look for (1) an error, (2) that is plain, and (3) that affects substantial rights of the defendant. *Griller,* 583 N.W.2d at 740. Reed does not explain why it was error for the court to reserve its decision on the admissibility of the conviction. We are aware of no case law, rule, or standard of conduct that would prohibit a district court from hearing a defendant's case-in-chief before ruling on the admissibility of a prior conviction for *Spreigl* purposes or to rebut the defendant's assertion of good character. Nor are we inclined to require a district court to give an advisory ruling on the admissibility of a prior conviction before the record for such a ruling is complete.

█ Reed could have asked for the evidentiary ruling, explaining to the court that his decision to present a defense was contingent on the ruling. If the court declined, Reed could have put on his defense and, if the conviction were ultimately admitted, challenged that admission on appeal. Defendants "often make decisions not to testify based on the potential damage that prior convictions could inflict on their credibility. The mere fact that a trial court would allow impeachment evidence if a defendant chooses to testify does not necessarily implicate his constitutional right to testify in his own defense." *State v. Gassler,* 505 N.W.2d 62, 68 (Minn. 1993). The district court did not commit plain error by reserving its ruling on the admissibility of Reed's prior conviction.

*Organizational Involvement*

█ Reed asserts that the district court abused its discretion by allowing introduction of Reed's involvement with black extremist organizations because this evidence inflamed potential bias and prejudice among members of the jury. The state asserts that the evidence of Reed's involvement in these groups was directly relevant to his commission of a racially- and politically-motivated crime.

In *State v. Ferguson,* we held that evidence of a defendant's gang affiliation was "essential to the state's proof of motive" to commit gang-related murder and, while arguably highly prejudicial, was also highly probative of that motive. 581 N.W.2d 824, 834–35 (Minn.1998). In *Looking Cloud,* the Eighth Circuit Court of Appeals held that evidence of the defendant's involvement in the American Indian Movement was admissible where the murder "could only be explained within the context of the American Indian Movement and its activities." 419 F.3d at 786–87.

The evidence of Reed's involvement with the organizations in question is essentially the same as the evidence properly admitted in *Ferguson* and *Looking Cloud.* It

was probative because it established a motive for Officer Sackett's murder and developed Reed's relationship with other witnesses, including Clark, Garrett, and Trimble–Smith. The state's theory of Officer Sackett's murder could only be understood against the backdrop of late 1960's racial tension, and Reed's motive could only be understood in the context of the organizations in which he apparently advocated killing police officers. The district court did not abuse its discretion.

*Accomplice Instructions*

Reed asserts that the district court erred in failing to give an accomplice corroboration instruction regarding the testimony of Griffin, Garrett, Walker, and Foster. Reed does not explain how these witnesses could be considered accomplices, and the record does not suggest that they were. The district court did not err.

*Jailhouse Conversation*

Reed asserts that statements he made in a jailhouse conversation with another inmate were hearsay and were improperly admitted at trial. A statement by a party offered against him at trial is not hearsay. Minn. R. Evid. 801(d)(2)(A). The district court did not err in admitting the statements.

*Recantation*

Finally, Reed asserts that Trimble–Smith has admitted that she lied in her testimony and that he is therefore entitled to a new trial. Cherra Trimble claims in a document titled "Affidavit," a copy of which is appended to Reed's pro se brief, that she is Trimble–Smith's daughter and that shortly after Reed's trial, Trimble–Smith admitted that she lied during her testimony because investigators plied her with money and promises of reward. The affidavit was signed and notarized on January 11, 2007, roughly ten months after the conclusion of Reed's trial.

"Courts have * * * looked with disfavor on motions for a new trial founded on alleged recantations unless there are extraordinary and unusual circumstances." *State v. Hill*, 312 Minn. 514, 523, 253 N.W.2d 378, 384 (1977). Minnesota follows the three-prong *Larrison* test in evaluating witness recantation claims. To obtain a new trial, a petitioner must establish the following by a fair preponderance of the evidence:

(1) the court must be reasonably well-satisfied that the testimony in question was false; (2) without that testimony the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until after trial.

*Opsahl v. State*, 677 N.W.2d 414, 422–23 (Minn.2004).

Reed has not satisfied any of *Larrison's* three prongs. He has not established that any of Trimble–Smith's testimony was false, for the affidavit contains only hearsay related by her daughter and does not specify which parts of her testimony were allegedly fabricated. Because he has not identified the fabricated testimony, Reed has not established that the jury might have reached a different conclusion without it. He also has not shown that any of Trimble–Smith's testimony took him by surprise. Therefore, the affidavit does not compel a new trial.

Affirmed.