# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-2541

_____

United States of America

*Plaintiff - Appellee*

v.

Darryl Parker

*Defendant - Appellant*

_____

No. 16-2598

_____

United States of America

*Plaintiff - Appellee*

v.

Veltrez Black

*Defendant - Appellant*

_____

No. 16-3086

_____

United States of America

*Plaintiff - Appellee*

v.

Jabari Johnson

*Defendant - Appellant*

_____

No. 16-3334

_____

United States of America

*Plaintiff - Appellee*

v.

Tywin Bender

*Defendant - Appellant*

_____

No. 16-3335

_____

United States of America

*Plaintiff - Appellee*

v.

Tywin Bender

*Defendant - Appellant*

_____

Appeals from United States District Court

for the District of Minnesota - St. Paul

_____

Submitted: May 10, 2017
Filed: September 12, 2017

_____

Before SMITH, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

SMITH, Chief Judge.

This is the consolidated appeal of four of eleven individuals indicted and convicted of conspiring to possess firearms, in violation of 18 U.S.C. §§ 371 and 922(g)(1). The conspiracy involved gang members with felony convictions who enlisted "straw purchasers," i.e., associates who could pass the requisite background checks, to obtain guns legally. The straw purchasers then gave the "legal" guns to the gang for its use. Codefendants Darryl Parker, Veltrez Black, Jabari Johnson, and Tywin Bender appeal their individual cases to this court.

## I. *Background*

North Minneapolis, Minnesota, knows gang violence. Two rival street gangs—the Taliban and the One-Nine Block Dipset—have traded high-profile homicides in a decades-long conflict.[1] When Tyrone "Ty Crack" Washington, a leader of "the One-Nine," was shot and killed at Epic nightclub in November 2013, the Taliban released a series of videos on Facebook and YouTube taunting members of the One-Nine and its derivative group, the Stick Up Boys (SUB). Retaliation soon began.

_____

[1]*See* Matt McKinney, *Three Charged in Gang Shootings*, Star Tribune, May 6, 2014, at B3; Matt McKinney & David Chanen, *A Bloody Summer of Gang Warfare Ahead?*, Star Tribune, May 27, 2010, at B1, B5.

Kibbie Walker, a Taliban member present at Epic nightclub on the night of Washington's murder, was shot by a One-Nine member as he left work in April 2014. Two weeks later, Walker fired multiple shots into a vehicle, hitting SUB-member Marquis Woods. Walker pleaded guilty to two counts of assault and was imprisoned. As the feud continued, members of the One-Nine began stockpiling weapons. To acquire weapons, the One-Nine recruited friends who did not have felony records to legally purchase firearms that would eventually become part of the gang's arsenal.

In November 2014, someone likely affiliated with the Taliban shot One-Nine-member Jabari Johnson multiple times. To avoid further reprisals, law enforcement indicted the leaders of the One-Nine and SUB. Nine gang members—including Veltrez Black, Tywin Bender, Darryl Parker, and Jabari Johnson—and two straw purchasers were indicted for conspiracy to illegally possess firearms. Each gang member was also indicted on a single count of felony gun possession. When police came to arrest Johnson, he credited the police arrests for preventing a gang battle, stating that his gang was "just about to go shoot them up." Johnson voluntarily led officers to a storage locker containing two Glock handguns, a Sig Sauer .9 mm, two AK-47 rifles, and high-capacity magazines. All defendants except Black pleaded guilty.

At Black's trial, the government presented evidence that the open hostilities underlying the present gang conflict began with the murder of Taliban-member Kyle Parker by One-Nine-member Christopher Bahtuoh in 2009. This killing was followed by the murder of SUB-member Dacari "Pudda Loc" Starr and Taliban-member Derrick "D-Nice" Martin. The government discussed Washington's murder at the nightclub and the subsequent drive-by shootings of residences belonging to Taliban members deemed responsible for Washington's murder. The government's proof placed Black in the presence of One-Nine members and firearms on five occasions during the conspiracy period. In one instance, Black was seen in a house with a large group of One-Nine members, where seven firearms were found. Two of the firearms,

a .45 mm Kimber and a Czech 7.62 mm rifle, were discovered in the same room as Black. Both guns had a mixture of DNA. A forensic biologist with the Hennepin County Sheriff's Office Crime Lab testified that Black's DNA could not be excluded from the mixtures. Firearms examiner Kristin Reynolds testified that gun casings found at residential shootings of Taliban members, on November 20 and 26, 2013 (shortly after Washington's murder), were consistent with the same Kimber pistol.

The government also presented two letters that Black wrote while in jail. In one, Black mentioned the death of Derrick "D-Nice" Martin. In the other, Black instructed a fellow inmate to identify the One-Nine as "1-9 pushup and 1-9 pipes" when talking to others. The government presented Facebook and Instagram posts showing Black in the company of One-Nine members, wearing clothing referencing the gang, and showing contempt for the Taliban. Many of these photos had inscriptions referencing the One-Nine. Minneapolis Police Officer Jaclyn Tuma, who specializes in gang intelligence, testified that the Minneapolis Police Department uses nine indicators to identify gang members. Black met seven. (A typical gang identification requires only three indicators.) Additionally, the government presented testimony from SUB-member Antonio Lewis and Taliban-member Kibbie Walker. Lewis and Walker both provided context to the gang war and the animosity between the Taliban and the One-Nine. After a six-day trial, the jury convicted Black of illegally possessing a firearm and conspiring to illegally possess firearms.

The day after Black's conviction, Tywin Bender (also known as Finn Winn), a SUB-leader and Black's codefendant, called a friend from prison using a borrowed telephone identification code. He instructed this friend to send e-mails to two people in the Rush City Correctional Facility, the location where witnesses Lewis and Walker were housed. He gave this instruction:

@FinnWinn
aye bro the n[****] bogus a rat he took the stand on chief,[2] smash him
as soon as you see him. green light. the n[****] kibby took the stand too
on chief. let everybody know. no talking no explanations.
#neversnitchonan[****]onadry
##Low-end
###FREEDAREAL

The prison staff intercepted one of the e-mails. The other e-mail reached its intended recipient and was found in his belongings. Although already imprisoned for the firearms conspiracy, Bender's action drew a new charge for conspiracy to retaliate against the government witnesses. Before jury deliberations began, Bender sought several jury instructions, including one regarding his First Amendment right to free speech. The district court rejected his proposed instructions. Bender was convicted, although his conspiracy codefendant was acquitted.

At sentencing, defendants Parker and Johnson each received the 60-month statutory maximum sentence for the firearm conspiracy, and they each received concurrent 78-month sentences for their respective illegal-possession counts. Bender received 60 months on the conspiracy conviction and an additional 70 months for the retaliation conviction. Black also received 60 months' imprisonment on the conspiracy charge and an additional 120 months for the possession charge. All four defendants appeal.

---

[2]Testimony revealed that "Bogus" and "Chief" are common nicknames for Antonio Lewis and Veltrez Black, respectively.

## II. *Discussion*

Black was convicted of, and Johnson and Parker pleaded guilty to, one count of conspiring to illegally possess firearms, in violation of 18 U.S.C. §§ 371 and 922(g)(1), and one count of illegally possessing a firearm, in violation of 18 U.S.C. § 922(g)(1). Bender pleaded guilty to one count of conspiring to illegally possess firearms, in violation of §§ 371 and 922(g)(1). Bender was also convicted of an additional count of conspiring to retaliate against a government witness, in violation of 18 U.S.C. § 1513(f), based on the e-mail that he sent to residents of the Rush City Correctional Facility. We will address each defendant's case in turn.

## A. *Veltrez Black*

Veltrez Black argues that the district court erred by (1) denying his motion for mistrial; (2) denying his motion for acquittal on the conspiracy conviction; and (3) denying his motion for acquittal on the possession conviction. We disagree with his arguments regarding the conspiracy conviction and his motion for mistrial and accordingly affirm those convictions. We agree, though, with his argument regarding his possession conviction and reverse.[3]

### 1. *Mistrial Based on Prejudicial Evidence*

"We review the denial of motions for mistrial for abuse of discretion," *United States v. Peoples*, 250 F.3d 630, 635 (8th Cir. 2001), and "[w]e review a district court's decision to admit or exclude testimony for an abuse of discretion," *United States v. Thunder*, 745 F.3d 870, 876 (8th Cir. 2014) (quoting *United States v. Jewell*, 614 F.3d 911, 918 (8th Cir.2010)). Black argues that the district court abused its discretion by permitting the government to introduce evidence showing that the One-Nine and the Taliban gangs engaged in ongoing acts of retaliation. Black argues that

---

[3]Black also argues that his overall sentence is substantively unreasonable. We need not address this argument because we are vacating his possession conviction and remanding his case for resentencing.

such evidence was "irrelevant, inflammatory, and unduly prejudicial." Because we find the evidence relevant and not unduly prejudicial, we affirm.

At trial, Black presented a "mere presence" defense. Although his brother and his cousins belonged to the One-Nine, Black argued that he innocently happened to be in their presence when they possessed firearms. Black argued that he did not agree to jointly possess guns with them, that he was not involved as a member of the One-Nine, and that he did not take part in the gang warfare. Black argues that because the evidence merely demonstrated association with the One-Nine and not his participation in the conspiracy, the evidence of gang violence merely served to prejudice him and convict him of having the wrong friends. We disagree.

"[A] defendant cannot be convicted because of his association with a group," *United States v. Looking Cloud*, 419 F.3d 781, 786 (8th Cir. 2005), but "[w]e have admitted evidence of a defendant's association with a group where the association establishes motive or opportunity to commit the crime." *Id.* We have admitted limited gang-related evidence to disprove a "mere presence" defense. *See United States v. Lemon*, 239 F.3d 968, 972 (8th Cir. 2001). We have also allowed gang-related evidence "to establish conspiracy or to rebut codefendants' innocent explanations of their relationships with one another." *United States v. Street*, 548 F.3d 618, 632 (8th Cir. 2008). "[G]ang-related evidence is often admissible where 'the defendant is . . . a gang member himself,' the issues in the case 'concern the *mere fact* of a defendant's gang membership . . . ,' and the evidence 'is generally an *unavoidable incident* of presenting other permissible evidence.'" *United States v. Gaines*, 859 F.3d 1128, 1131 (8th Cir. 2017) (internal quotation marks omitted) (first ellipsis in original) (quoting *United States v. Payne–Owens*, 845 F.3d 868, 873 (8th Cir. 2017)).

In *Looking Cloud*, we allowed evidence of gang-related activity because the defendant's conduct "could only be explained within the context" of his group's activity. 419 F.3d at 786. Evidence about the context of the gang activity "tended to

make the government's theory . . . more probable." *Id.* Proof of the defendant's involvement in the group was "crucial" to explain the defendant's motivation. *Id.* We held that the "evidence of mere membership" provided "a low risk" that the jury would find the defendant guilty of the crime by mere association. *Id.*

Black argues that the district court erred in allowing the government to discuss gang activity in its opening and closing statements. "The trial court has broad discretion in controlling the direction of opening statements and closing arguments, 'and this court will not reverse absent a showing of abuse of discretion.'" *United States v. Conrad*, 320 F.3d 851, 855 (8th Cir. 2003) (quoting *United States v. Johnson*, 968 F.2d 768, 769 (8th Cir. 1992)); *but see Street*, 548 F.3d at 629 (reversing the district court's denial of mistrial because the government's "main purpose" in its closing argument was to illustrate the violence of gangs and not the defendant's guilt). In Black's trial, the government stated its intent to present evidence relating to gang violence was for context only:

> Now, let me talk a little bit about this gang war that I have alluded to. And I want to caution you right now. This information that you're going to get about this gang war is being brought to you for a limited purpose. This Indictment does not accuse Mr. Black of having murdered anybody or having shot anybody, but it accuses him of being a member of a gang that was involved in a gang war. And the Indictment alleges that the existence of that gang war was one of the reasons they agreed to have all these guns together: to carry on the gang war.
>
> So you're going to hear about this gang war as kind of context and background and information that might help you decide what the people's motivation was for possessing these guns. . . . This information is being brought to you as background information so you can understand the context of what was going on.

The government discussed the very public and notorious gang war between the One-Nine and the Taliban, but it did so with the limited purpose of putting Black's actions in context.

On this record, we conclude that the district court did not abuse its discretion in allowing the government's statements, nor did it abuse its discretion in allowing evidence to support these statements. The gang information aided the jury in understanding Black's motivations for indirectly acquiring firearms. The government limited the information to relatively recent violence such as the 2009 murder of Taliban-member Kyle Parker by One-Nine member Christopher Bahtuoh. A photo posted on social media linked Black to this incident by depicting Black wearing a shirt asking the government to "free" Bahtuoh from prison. Black additionally referenced the 2010 murder of Derrick "D-Nice" Martin in his jail letter, further linking Black to the One-Nine gang. Information regarding the murder of One-Nine-member Washington, Black's older brother, showed a reasonable motive for Black to join the conspiracy. Evidence of the two house shootings in the aftermath of Washington's death was relevant because it connected the Kimber firearm to Black. Information relating to Kibbie Walker's significant involvement in the gang violence laid the foundation to introduce his testimony. Information regarding the actions of Black's codefendants Marquis Woods and Jabari Johnson went directly to proving the overt acts of the conspiracy. The district court accepted the government's use of the information to show Black's knowledge of the conspiracy and his motive to join it. The information did not unduly imply that Black actually took part in violent retaliations. The jury was told to use the information only for its intended purpose and not to convict Black based on his association.

Beyond admission of the gang violence background information, Black argues that other evidentiary rulings that the district court made unfairly prejudiced him. First, Black cites Officer Tuma's testimony as unfairly prejudicial. Black filed a pretrial motion in limine to exclude Tuma's testimony. The court allowed Tuma's

testimony over objection, but it instructed her not to testify about the "ultimate" conclusion of whether Black belonged to the One-Nine. Tuma abided by this restriction. In *Gaines*, we rejected a similar argument about testimony from a gang expert, saying that "we have repeatedly held explanatory evidence like this to be admissible." 859 F.3d at 1132. "Evidence is not unfairly prejudicial because it tends to prove guilt, but because it tends to encourage the jury to find guilt from improper reasoning. Whether there was unfair prejudice depends on whether there was an undue tendency to suggest decision on an improper basis." *United States v. Ramos*, 852 F.3d 747, 755 (8th Cir. 2017) (internal quotation marks omitted) (quoting *Looking Cloud*, 419 F.3d at 785). Tuma's testimony was not inflammatory, nor did it suggest that Black had taken part in any crime beyond joining the conspiracy. Tuma's discussion of the factors relating to Black's gang involvement was not unfairly prejudicial.

Second, Black argues that the district court erred by not limiting the testimony of ballistics expert Kristin Reynolds. Before trial, the court prohibited Reynolds from testifying that she was "100% sure" or "certain" that the relevant guns matched the relevant shell casings. On appeal, Black argues that Reynolds violated that restriction by describing the general reliability of the ballistics testing process. Reviewing the trial transcript, we conclude that Reynold's testimony stayed within the bounds set by the district court.

Third, Black argues that his Facebook and Instagram photos should have been excluded. He claims that the photos were not properly authenticated and that their admission unfairly prejudiced him. To the contrary, we find that they were supported by a proper foundation and provide probative, relevant evidence supporting the conspiracy charge.

Finally, Black argues that the "cumulative effect" of all this information made the trial "fundamentally unfair." Gang evidence cannot be used "if its purpose is

solely to prejudice the defendant or prove his guilt by association with unsavory characters." *Gaines*, 859 F.3d at 1131 (internal quotation marks omitted) (quoting *United States v. Ellison*, 616 F.3d 829, 833 (8th Cir. 2010)). "We have previously cautioned against the 'relentless attempt to convict [a defendant] through his association' with a gang . . . 'merely to show that [the defendant] is a bad person and thus more likely to have committed the crime.'" *Id.* at 1131–32 (alterations in original) (quoting *United States v. Roark*, 924 F.2d 1426, 1430–34 (8th Cir. 1991)). As noted above, the district court found that the government did not present the gang evidence for the this purpose. Evidence of the gang war directly related to the conspiracy's motivation and to Black's motivation to join it. The evidence of his association with the One-Nine directly related to his participation in that conspiracy. "Any unfairly prejudicial effect of the gang-related evidence did not substantially outweigh its probative value." *Id.* at 1132. The district court did not abuse its discretion in allowing this evidence or in denying Black's motion for mistrial.

## 2. *Conspiracy Conviction*

"In reviewing the denial of a motion for a judgment of acquittal, we review the sufficiency of the evidence *de novo*, evaluating the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor." *Thunder*, 745 F.3d at 874 (quoting *United States v. Wright*, 739 F.3d 1160, 1167 (8th Cir. 2014)). "The conspiracy's existence may be proved by direct or circumstantial evidence." *United States v. Rolon–Ramos*, 502 F.3d 750, 754 (8th Cir. 2007) (quoting *United States v. Cain*, 487 F.3d 1108, 1111 (8th Cir. 2007)). For a conspiracy conviction, the government need not prove a formal agreement existed, but rather "a tacit understanding" between the parties. *United States v. May*, 476 F.3d 638, 641 (8th Cir. 2007). We will not reverse the verdict if the evidence is sufficient for a jury to find beyond a reasonable doubt that the defendant participated in the conspiracy. *See id.*

Black argues that the government failed to produce sufficient evidence to prove beyond a reasonable doubt that he personally conspired to obtain weapons. *See Rolon–Ramos*, 502 F.3d at 754 (saying "a defendant's mere presence" or knowledge of a conspiracy is "insufficient to establish membership in a conspiracy" (quoting *United States v. Jimenez–Villasenor*, 270 F.3d 554, 558 (8th Cir. 2001)). The government charged Black of conspiring with members of the One-Nine street gang to possess weapons. To establish that conspiracy, the government had to prove: (1) an agreement existed; (2) Black joined it; (3) Black understood the agreement's purpose; and (4) a conspiracy member completed an overt act in furtherance of the conspiracy. *See United States v. Bassett*, 762 F.3d 681, 685 (8th Cir. 2014). The government met this burden.

The government showed that Black was in the presence of both One-Nine members and firearms five times during the conspiracy time frame. For example, during a search on December 12, 2013—a few weeks after Washington's death—law enforcement found Black in the presence of known One-Nine members and seven firearms. Law enforcement discovered guns and ammunition at various places throughout the residence, many of which had DNA samples of multiple individuals, implying collective possession. In fact, Black acknowledged receiving ammunition from his One-Nine associates immediately before the search:

Q.    Well, how is it that you knew there were bullets there?

A.    Deontae just told me that. There's some [bullets]—he said, "You need some shells in your gun?" And I was, "Yeah."

Q.    So Deontae told you that?

A.    Correct.

Q.    That if you needed shells for your gun they have some?

A.    Correct.

Black's admissions demonstrate knowledge of the group's practice of collectively sharing ammunition. Black admitted possessing a .22 mm Magnum hidden in the rafters of the house. All this evidence is probative of his knowledge of the One-Nine's collective and secret storage practices. Of the three guns found in the room with Black, two could not be excluded as having his DNA—all three had DNA mixtures of at least "four or more individuals" according to DNA expert Katherine Kingsland. Further, evidence about the other instances of possession show Black's knowledge of the gang's illegal possession of firearms and provide a strong inference of his active participation.

The government's case went beyond the circumstantial evidence placing Black in the presence of One-Nine members with firearms. It also presented evidence of Black's motivation to join the One-Nine's retaliation against the Taliban and that he indeed did so. The government presented various pictures from social media showing Black's public alignment with the One-Nine. One photo showed Black "throwing down" the Taliban gang sign, which is a statement of disrespect. The caption read, "One time for da 1-9. Queen Block." Another photo shows Black wearing a shirt saying "I am my brother's keeper" in honor of Washington, implying an intention to retaliate for his brother's death. Another photo included Black wearing the number 19 and the phrase "Long Live King Crack." Because social media has played a significant role in escalating the feud between the One-Nine and the Taliban, Black's public posts show support for his brother's gang beyond merely watching on the sidelines. These posts demonstrate Black that picked a side in the conflict.

The evidence presented at trial shows that (1) Black knew that the One-Nine members were fighting with the Taliban; (2) he intentionally joined that fight; (3) he knew the group was amassing weapons for the fight; and (4) Black, a felon, participated in illegally sharing weapons with other known felons. "[V]iewed in the

light most favorable to the verdict," the evidence presented at trial was sufficient to support Black's conviction for conspiracy. *Rolon–Ramos*, 502 F.3d at 754; *see also United States v. Herra–Herra*, 860 F.3d 1128, 1132 (8th Cir. 2017) ("Given our standard of review, there was enough circumstantial evidence at trial to establish that there was a . . . conspiracy, that [the defendant] knew of the conspiracy, and that he intentionally became a part of it.").

### 3. *Possession Conviction*

The government indicted Black for illegal possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Authorities found the allegedly illegal firearm after a police chase involving a vehicle that Black occupied. Black contends that there is insufficient evidence to support his conviction. We agree and therefore vacate this conviction.

On April 22, 2014, law enforcement executed a warrant for Black's arrest on a charge of violating supervised release. Officers observed Black retrieve an unidentified object from his own vehicle and then enter a vehicle driven by One-Nine-member Omar Rush. In an unmarked vehicle, Officers Ryan Hjelm and Benjamin Johnson followed Rush's vehicle and attempted to make a stop. Rush pulled into an apartment complex and stopped momentarily. Officers saw Black "bend over like he was reaching under the [passenger] seat." When the officers exited their vehicle, Rush rapidly sped away. The careening vehicle made a quick left turn and collided with an oncoming pickup truck. Rush continued before the officers stopped the car a few blocks away. The officers recorded the entire chase using their dashboard camera. Unfortunately, Rush's vehicle is out of frame for about three seconds as it rounds a corner and is obscured by a building.[4]

---

[4]This video was submitted into evidence, and the court has reviewed it.

After the chase ended, a maintenance worker for the apartment complex arrived on scene and noticed a firearm. The firearm was located along the path traveled by the vehicle that Black occupied. The maintenance worker alerted law enforcement, stating, "Maybe that's what you're looking for." Until then, law enforcement did not suspect that a firearm could be involved in the chase. The dashboard camera does not show a gun leaving the vehicle, nor does it show a door open or a hand reaching out of the window. Forensic examination of the gun did not reveal any DNA or fingerprint evidence. None of the officers or other witnesses testified to seeing any activity from inside the vehicle to connect it to the weapon during those missing three seconds of footage, as the testimony of Officer Hjelm illustrates:

> Q.     [A]t any point during this chase did you see any of the car doors open and something being dropped?
>
> A.     No.
>
> Q.     At this point did you see anything being thrown out?
>
> A.     No.
>
> ***
>
> Q.     You have no idea how that object got there, right?
>
> A.     I have a speculation.

"While reasonable inferences from the evidence weigh against the defendant, speculation does not." *United States v. Pace*, 922 F.2d 451, 453 (8th Cir. 1990). The government argues that five distinct inferences raise the evidence presented against Black above speculation, but they are not persuasive. First, the government argues that in a prison letter from 2010, Black wrote that he would carry a gun "at all times," and the jury could infer that he was likely carrying a gun in this instance—especially noting that officers testified that Black went to his vehicle to retrieve an unidentified

item before the chase began. Black's statement in 2010 that he would carry a gun at all times does not sufficiently support an inference that he actually had one on April 22, 2014. At best, the 2010 statement goes to propensity. *See United States v. Johnson*, 439 F.3d 884, 887 (8th Cir. 2006) ("Propensity evidence, whether of a person's general character or examples of specific bad acts, is ordinarily excluded because of the likelihood the jury may misuse it.").

Second, the government relies on the "furtive movements" Black made when the vehicle initially stopped before the chase, citing *United States v. Chatmon*, 742 F.3d 350, 352 (8th Cir. 2014), for the proposition that such movements move the inference of possession beyond speculation. In *Chatmon*, we upheld a possession charge for a gun discovered by police in a hidden compartment of the vehicle that the defendant was driving before his arrest. *Id.* at 351. The defendant's constructive possession of the vehicle, plus his movements inside the vehicle immediately before arrest near the secret compartment, amounted to sufficient evidence to support the conviction. *Id.* at 352–53. Black's movements, however, occurred before the chase began—and unlike those in *Chatmon*, they are not directly connected to the gun's location or to the defendant's constructive possession of the vehicle.

Third, the government points to Black's flight from police as proof of gun possession. *See United States v. Garrett*, 648 F.3d 618, 622 (8th Cir. 2011) (affirming a conviction when defendant's flight evidence was coupled with eye-witness testimony). This fact does not advance the quantum of proof for Black's alleged gun possession beyond speculation. Black was not driving, and the decision to flee could have been Rush's alone, himself a convicted felon. Black also knew that a warrant for his arrest had been issued for violating supervised release. This too could explain Black's flight, regardless of any firearm possession. "[T]he government must show a sufficient nexus between the defendant and the firearm." *Id.* (quoting *United States v. Evans*, 431 F.3d 342, 345 (8th Cir. 2005)). In *Garrett*, a witness testified that she "observed a hand throw a gun out of the window," and we upheld the verdict because

-17-

"[t]he jury could infer from Garrett's actions of fleeing the scene of the traffic stop and the testimony about the gun that he unlawfully possessed the firearm." *Id.* at 622–23. Without testimony actually connecting the gun to the fleeing vehicle or to Black, the government's proof falls short of enabling a jury to make a reasonable inference of possession.

Fourth, the government contends that only Black could have thrown the gun because the driver of the pickup truck struck by Black's vehicle saw Rush with "his hands on the steering wheel." But, the driver also admitted that he "probably wouldn't have seen" Rush throw the gun if Rush had done so. Even if the driver's testimony completely precluded a finding that Rush tossed the gun, his testimony alone does not preclude the possibility that the gun was already on the ground before the vehicle even arrived. Thus, we are left with only speculative inferences to conclude that the gun came from Black.

Finally, the government argues that because the gun was found at "the exact spot" where Black was out of camera view and because there was asphalt on the gun, the only reasonable inference is that the firearm came from Black. We disagree. On these facts, assuming the firearm came from the vehicle at all is speculative.

To establish firearm possession, the government had to prove actual or constructive possession beyond a reasonable doubt. *Garrett*, 648 F.3d at 622. It is possible that Black possessed the firearm and discarded it as the government alleged, but based on the record evidence, we think "a conscientious mind would have to have entertained a reasonable doubt." *Ramos*, 852 F.3d at 755 (quoting *United States v. Hall*, 999 F.2d 1298, 1299 (8th Cir. 1993)). Therefore, we vacate Black's firearm possession conviction due to insufficient evidence and remand for resentencing.[5]

---

[5]Because we vacate Black's conviction, we need not address his argument that the district court erred by failing to dismiss his possession charge for inaccurate

## B. *Tywin Bender*

Tywin Bender brings two arguments on appeal. First, he argues that the district court erred in denying his prospective jury instructions. In this respect, we affirm Bender's conviction. Second, he argues that his sentence is procedurally unsound and substantively unreasonable. We find that Bender's sentence is procedurally unsound because of a Guidelines calculation error, and we vacate Bender's sentence and remand for resentencing.

### 1. *Jury Instructions*

"We review a district court's rejection of [a] defendant's proposed instruction for abuse of discretion, and we recognize that district courts are entitled to broad discretion in formulating the jury instructions." "We will affirm so long as the jury instructions given by the district court, 'taken as a whole, fairly and adequately submitted the issues to the jury.'"

*Thunder*, 745 F.3d at 873–74 (alteration in original) (citations omitted) (first quoting *United States v. Ironi*, 525 F.3d 683, 688 (8th Cir. 2008); and then quoting *Chatmon*, 742 F.3d at 354). Bender contends that the district court abused its discretion in denying his instructions about his free speech defense, the elements of conspiracy, and the time frame of the conspiracy.

### a. *Free Speech Instruction*

Bender argues that the district court erred in rejecting his request for a jury instruction regarding his defense based on the Free Speech Clause of the First Amendment of the U.S. Constitution. *See Camreta v. Greene*, 563 U.S. 692, 727 (2011) (Kennedy, J., dissenting) (saying the Constitution may be used "as a defense against criminal prosecution"). He argues that he had a First Amendment right to state his disapproval of the behavior of the two government witnesses via the e-mail that

_____

indictment testimony.

-19-

he sent to prisoners at the Rush City Correctional Facility. He contends that the e-mail did not constitute a true threat but rather was protected speech.

In denying Bender's free speech instruction, the district court concluded that

> all of the purported First Amendment issues raised by Defendants are simply another way of arguing Defendants did not act with intent to retaliate. Accordingly, the Court does not believe the jury need be or should be given separate First Amendment instructions, as it will be expressly instructed that it must find the Defendants acted with intent in order to be found guilty; further instructions may both confuse the issues and be unnecessarily complex. Defendants are free, of course, to argue to the jury that they did not act with intent to retaliate (and the Court will consider a theory-of-defense instruction along these lines once such an instruction has been submitted) . . . .

Bender relies on *Elonis v. United States*, 135 S. Ct. 2001, 2013 (2015), in which the Supreme Court reversed a defendant's conviction of threatening his ex-wife on Facebook because the court's instructions did not require the jury to consider the defendant's intent in making the posts but rather the reasonable observer's interpretation of them. We find *Elonis* inapplicable to Bender's case.

"As in other First Amendment cases, the court is obligated 'to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks omitted) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984)). The First Amendment prohibits the punishment of expressing unpopular ideas, "so long as there is no showing of an intent to incite disobedience" to constitutional laws. *Cohen v. California*, 403 U.S. 15, 18 (1971). Here, the record facts do not support Bender's claim that he was simply exercising his First Amendment rights. The facts

established at trial show that Bender conspired to threaten government witnesses. The First Amendment does not shield such speech.

Bender argues that his e-mails were merely "idle" threats, like rap lyrics, which—although offensive to some—are still entitled to protection under the Free Speech Clause. *See id.* at 25 ("[O]ne man's vulgarity is another's lyric."). The facts belie his argument. Bender claims that the e-mails were never meant to be delivered, but in fact one of the messages reached its intended recipient, and the other would have done so if it had not been intercepted by corrections officers. Bender claims that he was only expressing negative emotions, yet the e-mails clearly instruct his fellow gang members to "smash" the witnesses with "no talking" and "no explanations." Bender attempted to achieve anonymity by having a friend send the e-mails via a different prisoner's telephone identification number. Such secrecy suggests that the e-mails were not merely "idle" threats. "Defendants are entitled to a theory of defense instruction if it is timely requested, is supported by the evidence, and is a correct statement of the law." *Thunder*, 745 F.3d at 874 (quoting *Chatmon*, 742 F.3d at 354). Bender's defense was not supported by the evidence. The district court did not abuse its discretion in denying his First Amendment instruction.

### b. *Conspiracy Elements*

Bender next argues that the district court abused its discretion by not accepting the following jury instruction: "For a conspiracy to exist there must be at least two co-conspirators, since one cannot conspire with oneself." (citing *United States v. Gisehaltz*, 278 F. Supp. 434, 437 (S.D.N.Y. 1967)). Bender's co-conspirator was acquitted, and thus Bender argues that the jury wrongfully convicted him for conspiring with himself. We find this argument without merit.

First, it is not unusual for a conspiracy conviction to stand even if one codefendant is acquitted. Our focus centers on the strength of the evidence that the defendant conspired to commit the offense. The conviction will be upheld if it is

supported by sufficient evidence. *See Bassett*, 762 F.3d at 685. Second, the jury was instructed that in order to find a conspiracy in Bender's case, they had to agree that "two or more persons reached an agreement to retaliate against witnesses Antonio Lewis and Kibbie Walker." The evidence against Bender was sufficient to establish that he conspired with his codefendant to retaliate against the government witnesses. The instruction, like the one Bender requested, required at least two coconspirators. And, it accurately described the law. *See id.* (approving a similar instruction). "We conclude that the district court's instructions adequately submitted the issues to the jury and that it did not abuse its discretion in denying the requested instruction." *Soo Line R.R. Co. v. Werner Enters.*, 825 F.3d 413, 422 (8th Cir. 2016).

### c. *Conspiracy Time Frame*

Finally, Bender argues that the jury instructions allowed him to be convicted for actions outside of the indictment because the instructions included the following sentence: "The [conspiracy] agreement may last a long time or a short time." Bender relies on *Stirone v. United States*, in which the Supreme Court reversed a defendant's conviction because the conviction "no longer [reflected] the indictment of the grand jury." 361 U.S. 212, 216 (1960) (quoting *Ex parte Bain*, 121 U.S. 1, 13 (1887)); *see also United States v. Spencer*, 592 F.3d 866, 873 (8th Cir. 2010) ("A constructive amendment of an indictment occurs when jury instructions broaden the scope of an indictment by permitting a conviction for an uncharged offense."). Bender's case, however, is distinguishable from *Stirone*.

Bender's indictment alleged a conspiracy "[f]rom on or about at least October 23, 2015[,] through on or about October 25, 2015, . . . with intent to retaliate against [Lewis] and [Walker] for their testimony . . . given on October 19, 2015." Bender argues that it was impossible for him to conspire to retaliate with the other inmates during the indictment time frame because a several day delay in the jail's mail system prevented the other inmates from receiving his threatening messages during that time. *See United States v. Easom*, 569 F.2d 457, 459 (8th Cir. 1978) (reversing a jury

-22-

instruction when no evidence was presented to show existence of a conspiracy during the relevant date). This argument misunderstands the facts and the law. Bender was indicted for conspiring with his codefendant outside of jail to send the messages to his fellow inmates. Bender was indicted for the conspiracy with his non-inmate codefendant—not a conspiracy with the other inmates. All the communications between Bender and his codefendant, and the steps that his codefendant took to send the messages, occurred during the relevant time frame. Further, evidence presented at trial covered only the time frame as described in the indictment. The government needed to show only that Bender conspired with his codefendant during the indictment time frame. *See Spencer*, 592 F.3d at 876. The district court did not abuse its discretion by denying Bender's objection to the time-frame jury instruction.

Finding his jury instructions arguments without merit, we affirm Bender's conviction.

### 2. *Bender's Sentence*

Additionally, Bender appeals his sentence as substantively unreasonable and procedurally unsound. "We review a district court's sentence in two steps: first, we review for significant procedural error; and second, if there is no significant procedural error, we review for substantive reasonableness." *United States v. Sadler*, No. 16-3946, 2017 WL 3139446, at *2 (8th Cir. July 25, 2017) (quoting *United States v. O'Connor*, 567 F.3d 395, 397 (8th Cir. 2009)). Improperly calculating a defendant's Guidelines range is a significant procedural error. *Molina–Martinez v. United States*, 136 S. Ct. 1338, 1345–46 (2016). We review the district court's application of the Guidelines de novo. *United States v. Mitchell*, 825 F.3d 422, 425 (8th Cir. 2016) (per curiam).

Bender pleaded guilty to the firearm conspiracy charge included in the initial group indictment. Later, Bender was also convicted of conspiring to retaliate against the government witnesses. These two cases, related and close in time, were combined

for sentencing purposes. At sentencing, the district court calculated a Guidelines range of 210 to 262 months. To set this range, the court grouped Bender's two sentences and selected the range provided by the conviction with the highest Guidelines range—the firearm conspiracy. This calculation included a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. Bender objected to this enhancement.

In *United States v. Galaviz*, we reversed the application of the obstruction-of-justice enhancement for a similarly situated defendant. 687 F.3d 1042, 1043 (8th Cir. 2012). Galaviz, the defendant, pleaded guilty and, after being imprisoned, conspired to murder the confidential informant (CI) in his case. *Id.* Looking at the language of § 3C1.1, we said that "because Mr. Galaviz had already pleaded guilty, he could not have intended to obstruct justice 'with respect to the instant offense' by plotting to kill [the CI] unless he thought that [the CI] was going to testify against him at sentencing." *Id.* (quoting § 3C1.1(1)). When "there is no evidence that retaliation would impede the progress of [the defendant's] case in any way," the enhancement pursuant to § 3C1.1 cannot be applied. *Id.*

Though Bender did not bring *Galaviz* to the district court's attention, it controls here and requires that we vacate Bender's sentence. Although Bender conspired against witnesses in Black's trial, the government did not establish that Bender believed these witnesses would be used against him during *sentencing*, and in fact, they were not. Even construing Bender's actions as relating to "an otherwise closely related case, such as that of a codefendant," *see* § 3C1.1 cmt. n.1, the retaliation occurred after Black's trial concluded. Thus, under *Galaviz*, Bender's actions were not "intended to obstruct justice on the instant offense of conviction." 687 F.3d at 1043. Bender was properly prosecuted for retaliating against a government witness, and this retaliation occurred after he and his codefendants had all been found guilty. Thus, the obstruction-of-justice enhancement did not apply in calculating Bender's

Guidelines range regarding his previously pleaded charge. Therefore, we vacate Bender's sentence and remand his case for resentencing.

## C. *Jabari Johnson*

Jabari Johnson pleaded guilty to the firearm conspiracy charge and a separate count of felony possession. Although the probation office suggested a Guidelines range of 130 to 162 months' imprisonment, at sentencing the government sought to honor the Guidelines range of 63 to 78 months contained in Johnson's plea agreement. The district court sentenced Johnson to 60 months for the conspiracy charge and 78 months for the possession charge. Johnson argues that the district court committed procedural error by failing to adequately justify the sentence imposed, although he failed to make this objection at sentencing. He also argues that the district court imposed a substantively unreasonable sentence because it failed to adequately consider the factors under 18 U.S.C. § 3553(a). We disagree.

When we review a defendant's sentence, we "first ensure that the district court committed no significant procedural error," such as "failing to adequately explain the chosen sentence." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). When the defendant fails to object to the adequacy explanation of a sentence, we review the explanation for plain error. *See United States v. Chavarria–Ortiz*, 828 F.3d 668, 671 (8th Cir. 2016). "[W]here a matter is conceptually simple, and the record makes clear that the sentencing judge considered the evidence and arguments, the law does not require the judge to write or say more." *Id.* (citing *Rita v. United States*, 551 U.S. 338, 359 (2007)). "Sentences within the advisory Guidelines range are presumed reasonable . . . ." *Herra–Herra*, 860 F.3d at 1132.

In memoranda to the court, Johnson argued that three separate factors supported a downward variance: (1) he suffered hardship in county facilities because of his gunshot wound; (2) he had provided assistance to law enforcement; and (3) and

-25-

his criminal history was overstated. At sentencing, the district court heard statements from counsel, commented on the numerous letters submitted by Johnson's family, and thanked Johnson's supporters for attending the hearing. The court also admitted into evidence a letter that Johnson wrote. After counsel argued the variance motion, the court individually rejected all three of Johnson's reasons for a downward variance. The court, recognizing Johnson's continuing medical needs, stated, "I will recommend a medical facility" for Johnson's placement.

When "[t]he record shows that the court listened to the parties' arguments and determined that the circumstances did not warrant a downward variance," we find no error (much less plain) if there is "nothing to suggest a reasonable probability that the district court would have imposed a more lenient sentence if the court had elected to discuss the appropriateness of the sentence at greater length." *Chavarria–Ortiz*, 828 F.3d at 672. The record demonstrates that the district court considered Johnson's variance motion, even asking Johnson's counsel to present further arguments. The court rejected Johnson's three arguments individually, but took into account Johnson's medical argument for recommending him to a medical facility. We find no error, plain or otherwise, here.

For similar reasons, Johnson argues that his sentence was substantively unreasonable because the district court "fail[ed] to consider . . . relevant factor[s] that should have received significant weight." *Feemster*, 572 F.3d at 461 (quoting *United States v. Kane*, 552 F.3d 748, 752 (8th Cir. 2009)). Johnson argues that the district court failed to consider his medical needs, his good characteristics, or his assistance to law enforcement. The record belies these contentions. As noted above, in response to Johnson's medical needs, the court recommended a medical facility. The court recognized "the likelihood that [Johnson's family] support will be there" upon release from imprisonment, but did not find that his good personal characteristics warranted a lower sentence:

[W]ell, he has an extensive criminal record. He has been in trouble for a long time; and as I go through the sentencing recommendation from the Pretrial Services, they outline—just it's basically a life of crime. And he has some good qualities, there's no question about that. But everything in here indicates that he is likely, unless a sentence is imposed which will get the message across to him, he's likely to commit further crimes. . . .

***

So I take all these factors into account and it's my judgment that the appropriate sentence in this case will be a sentence of 78 months. That's the high end of the guideline range, but I think it's the appropriate end of the guideline range.

Regarding Johnson's assistance to law enforcement, the court stated: "He probably did [help] in some ways, but the Government has not come and asked to have a departure on that ground; and I think without the Government asking for it, I'm in no position to rule on that in his favor." Johnson also argues that the district court weighed his criminal history too heavily, but the district court "has wide latitude to weigh the § 3553(a) factors and assign some factors greater weight than others in determining an appropriate sentence." *United States v. Boykin*, 850 F.3d 985, 989 (8th Cir. 2017) (per curiam) (quoting *United States v. David*, 682 F.3d 1074, 1077 (8th Cir. 2012)). The transcript shows that the court did consider Johnson's arguments, but just did not give them the weight that Johnson preferred. Therefore, we affirm Johnson's sentence.

### D. *Darryl Parker*

Darryl Parker received an identical sentence to his codefendant Jabari Johnson—60 months' imprisonment for the conspiracy charge and an additional 78 months for his individual possession charge to run concurrently. Because Parker does not allege a procedural error, "we consider only the substantive reasonableness of his sentence for an abuse of discretion." *Boykin*, 850 F.3d at 988. "[I]t will be the

unusual case when we reverse a district court sentence as substantively unreasonable." *David*, 682 F.3d at 1077. In this review, we may presume "that a within-Guidelines sentence is reasonable." *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013). "This review is 'narrow and deferential.'" *United States v. Hairy Chin*, 850 F.3d 398, 403 (8th Cir. 2017) (quoting *Feemster*, 572 F.3d at 464).

Although Parker recognizes that he agreed to a Guideline range of 63 to 78 months' imprisonment in his plea agreement, he argues that any sentence above 63 months would be unreasonable. According to Parker, unlike his codefendants, he "was not the perpetrator of any of [the] individual acts of violence," and he claims that his criminal history, although calculated at a Category VI, lacks the "serious acts of violence" perpetrated by his codefendants. He also points to the "real and significant steps toward changing his life for good" in taking classes while incarcerated. Parker suggests that the district court abused its discretion in failing to grant him a downward variance because his sentence is "greater than necessary." *See* 18 U.S.C. § 3553(a). Parker made all these arguments before the district court, and the court rejected them:

> I don't think there's grounds for [a variance] in this case. I think the Defendant's conduct here and his history would indicate that he is properly in the guideline range in which he finds himself today. I'm not convinced that he has made a turn yet in his conduct. He says he does, he says he will. He wants to go back to the family. But I think it's almost too late for that. Not too late in the sense of at some point in time, but right now.

"The Supreme Court has instructed the sentencing court to consider the § 3553(a) factors in formulating its sentencing decisions to fit the specific circumstances of each defendant." *Boykin*, 850 F.3d at 989. Of these factors, the district court has to consider whether the sentence "afford[s] adequate deterrence" and "the need to avoid unwarranted sentence disparities" among similarly situated

defendants. 18 U.S.C. § 3553(a). For Parker, the district court imposed the exact same sentence that it imposed on his codefendant Johnson, and Parker's sentence typifies those of his other conspiracy codefendants as a whole. The district court determined that Johnson's sentence was appropriate for his specific crime and personal characteristics. We will not reverse the district court simply because it assigned greater weight to certain factors than others in fashioning the defendant's sentence. *Boykin*, 850 F.3d at 989. "The district court did not abuse its discretion"; Parker's "final sentence is not substantively unreasonable." *Hairy Chin*, 850 F.3d at 404.

### III. *Conclusion*

We therefore affirm the sentences of Darryl Parker and Jabari Johnson; affirm the retaliation conviction of Tywin Bender; and affirm Veltrez Black's conspiracy conviction. We vacate Black's possession conviction for insufficient evidence and vacate Bender's sentence as procedurally unsound. We remand Black and Bender's cases to the district court for resentencing.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

I concur in all but Part II.A.3, footnote 3, and Part III of the court's opinion. I would affirm Veltrez Black's conviction for unlawful possession of a firearm.

In reversing Black's conviction based on an assertion of insufficient evidence, the majority presents an argument of the sort that one might expect from capable defense counsel at trial. The opinion discusses five incriminating pieces of evidence separately, hypothesizes why each might be discounted or explained away, and then concludes that there must be reasonable doubt. Suggesting a "gotcha" moment, the court cites the testimony of one police officer that he personally had "a speculation" about the genesis of the seized firearm, and implies that *the jury*—after considering *all* of the evidence in accordance with proper instructions—merely speculated in reaching its verdict.

This is not the correct approach to appellate review of a jury verdict. We review only the legal question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In conducting that review, we must evaluate the evidence collectively, taking it all together as a unified whole, not divide it into discrete categories to be analyzed separately. And we must remember that "circumstantial evidence is intrinsically as probative as direct evidence." *United States v. Wilcox*, 50 F.3d 600, 602-03 (8th Cir. 1995) (quoting *Durns v. United States*, 562 F.2d 542, 546 (8th Cir. 1977)). There is no requirement that the prosecution produce a witness who saw Black with a gun in hand or tossing a firearm out the window.

The government here presented a convincing circumstantial case that Black possessed a firearm that he threw from Omar Rush's vehicle during flight from police on April 22, 2014. Black acknowledged his intent to possess firearms when he wrote a letter from prison in 2010, saying that he had been leaving his gun at home, but that "now" it is going "to be on my hip at all times." This is not "propensity" evidence, *ante*, at 17; it is an admission that was received in evidence without limitation. The issue here is not admissibility of evidence, but sufficiency of proof.

On the date of the charged offense, police conducted surveillance of Black and his cousin Omar Rush. They saw Black get into his own car briefly before entering Rush's vehicle as the passenger. Black denied that he possessed a gun while with Rush and testified that he had retrieved a phone charger from his own car before entering Rush's. But an officer who later searched Rush's vehicle after the chase said police did not find "anything" in the car; another officer said that they found "nothing."

-30-

Police then followed the two men and attempted a traffic stop of Rush and Black in the parking lot of an apartment complex. After Rush and Black momentarily pulled over, an officer saw Black open the passenger door slightly and lean toward the floor. A second officer testified that he also saw Black lean forward "like he was reaching under the seat," and that based on Black's movements, he believed that Black "was possibly armed or hiding something." A jury could infer that Black was handling a firearm or attempting to conceal it.

Rush and Black then fled at a high rate of speed through the parking lot. At one point, after a long straightaway, the suspect vehicle made a ninety-degree left turn. As Rush and Black turned the corner, an oncoming pickup truck blocked the view from the trailing police car, and the officers could not see the suspect vehicle for a few seconds. After the chase ended, police found a firearm—covered with asphalt-like debris and displaying a marred rear sight assembly—on the ground to the right of the path where the Rush/Black vehicle had passed. The gun was found in the exact spot where the passenger side of the suspect vehicle passed while it was out of sight of the police officers during the chase. A jury could infer that Black chose to discard the gun at the precise moment when he knew that the officers could not see him.

The driver of the truck, who was an employee of the apartment complex, testified that when the Rush/Black vehicle came around the corner, he saw Rush with both hands on the steering wheel. The jury reasonably could conclude that this evidence, together with the location of the firearm on the right side of the vehicle's path, eliminated Rush as the person who tossed the gun.

The truck driver did not see a gun on the ground when he approached his truck just before Rush and Black drove past. Another employee, who first saw the gun after the car chase, said that he did not see the gun when he likely passed the spot earlier in the day. Neither employee had ever seen a firearm on the ground in several

years of working at the complex. The jury reasonably could infer that the gun came from Black during the car chase, not from another source.

Black testified at trial. He denied doing anything with his hands after the traffic stop, and denied throwing a firearm out the window during the chase. In cross-examination about his credibility, Black admitted to prior convictions for aiding and abetting a drive-by shooting, aggravated robbery, and twice unlawfully possessing a firearm, in 2011 and 2013. He also admitted to attempting to bribe a prosecution witness to change his testimony in the aggravated robbery case. The jury reasonably could discredit Black's denials.

Taking all of this circumstantial evidence together, a rational jury could conclude beyond a reasonable doubt that Black possessed a firearm on April 22, 2014. The jury rationally could infer beyond a reasonable doubt that Black brought a firearm (not an undiscovered phone charger) to Rush's car, that the two men fled from police after Black considered whether to conceal the gun under his seat, that Black threw the gun out the window when he knew that he could not be seen by police, and that Black lied at trial when he denied possessing the gun.

In deciding whether there was proof beyond a reasonable doubt, the jury was permitted to consider whether the confluence of all these circumstances—the pledge to carry a gun at all times, the furtive movements after the initial stop, the flight from police, the discovery of the damaged gun on the chase route precisely where the vehicle went out of sight, and the employees' testimony that no gun was seen earlier—could reasonably be explained as merely an unlucky coincidence for Black. The majority's contrary approach of proffering innocent explanations for each piece of evidence in isolation and concluding that there must be reasonable doubt is

inconsistent with the proper standard of review. The jury was not irrational to return a verdict of guilty. I would affirm the judgment of conviction in Black's case.[6]

––––––––––––––––––––––––––––––

[6]I would reject Black's alternative argument that inaccurate testimony by a police officer before the grand jury warranted dismissal of the indictment. *See United States v. Aldridge*, 561 F.3d 759, 763-64 (8th Cir. 2009). I also conclude that the district court did not abuse its discretion in imposing Black's sentence.